## Carnegie Nat. Gas. Co., Appellant, v. Philadelphia Co.

*Oil lease—Failure to drill test well—Forfeiture.*

An oil lease provided that a well should be drilled within six months from the date of the lease. The lease further contained the following clause: "The test to be drilled on the above described lease or forfeit this lease." *Held*, that the test well must be drilled upon the land demised by the lease, and that a well drilled upon adjoining land is not sufficient to prevent forfeiture.

*Signing of lease—Acceptance of lease.*

If a lessee who has not signed the lease accepts it when signed and sealed by the lessor, the lease binds him the same as if he had executed it.

*Forfeiture by lessor in possession.*

A notice, by a lessor in possession of the premises described in the lease, to the lessee, that the lease is forfeited, is substantially a declaration that he will refuse to give the lessee possession of the land, and if the lessee assents to this action and accepts a new lease from the lessor, he rescinds the former lease and terminates all his rights thereunder.

*Assignment of lease—Notice of terms of lease—Forfeiture.*

Where a lease provides for forfeiture in certain cases, the assignee of the lease is bound at his peril to ascertain whether or not it has been forfeited.

*Notice of assignment of lease.*

A lessor is not affected by a mere general rumor that the lease has been assigned by the lessee to another person. The information as to such assignment must come from some person interested in the property, and must be directly communicated to the lessor.

*Equity jurisdiction—Oil lease—Injunction.*

Equity has jurisdiction to award an injunction in a contest over the right to operate land for oil, where the lease under which the right is claimed does not grant a conveyance in fee, but merely an incorporeal hereditament.

Argued Oct. 27, 1893. Appeal, No. 174, Oct. T., 1893, by plaintiff, from decree of C. P. No. 2, Allegheny Co., Jan. T., 1893, No. 184, dismissing bill in equity. Before STERRETT, C. J., GREEN, WILLIAMS, McCOLLUM, MITCHELL, DEAN and THOMPSON, JJ.

Bill to restrain the drilling of oil wells.

The case was referred to Thomas Patterson, Esq., as master, who reported as follows :

" The bill of the Carnegie Natural Gas Company sets forth that Joseph Lytle, the owner of some four hundred acres of land in Forward township, Allegheny county, on December 18, 1891, made an oil and gas lease of the territory mentioned, to one John A. Snee, said lease being duly recorded and a copy attached to the bill. On August 5, 1892, Snee assigned this lease to plaintiff company, which, on August 11, 1892, entered on the premises, and on October 6th of the same year completed a producing gas well thereon. That the lessee and his assigns have kept all covenants and conditions by them to be

kept and performed. That the defendant company, with knowledge of plaintiff's rights, has entered upon the leased premises, and is about to drill a well for oil and gas thereon. That this drilling will work irreparable injury to plaintiff, and praying for an injunction.

" The answer of the Philadelphia Company substantially avers that the lease of December 18, 1891, was never accepted by Snee, he not having signed it until after August 5, 1892 ; and that if said lease was operative to vest any title in Snee it was forfeited and determined prior to August 5, 1892, of which fact the plaintiff had notice. That on August 8, 1892, Snee, recognizing the forfeiture, obtained from Lytle a new lease in lieu of that of December 18, 1891, paid Lytle a bonus, and accepted such new lease with different terms and conditions, said new lease covering the same tract as before, with the exception of five acres, which Lytle had in the meantime sold to Jesse Wall. That Snee, or his assigns, entered on the lands of Lytle under terms of his second lease, and not that of December 18, 1891. That the entry and operations of defendant company are confined to the five acres excluded from the second lease ; said entry being by virtue of a lease from Wall to defendant company, dated October 6, 1892. Defendant claims no rights in any other portions of the tract than the five acres mentioned.

" Certain facts leading up to the controverted matters are not in dispute, and a brief review of them will render a consideration of disputed points more intelligible.

" It would seem that, prior to the close of the year 1891, there had been considerable activity in oil and gas drilling and production in the parts of Allegheny and Washington counties lying opposite to Forward township. The Monongahela river at this point makes quite a circle or angle to the west, in which angle Forward township extends. John A. Snee, who had been for some time interested in drilling wells 'in this neighborhood, determined, in the latter part of 1891, to secure leases of a number of farms or tracts of land in Forward township, and lying in the angle mentioned. Mr. Owings, the first witness called by plaintiff, was his agent in calling upon the owners and taking leases. He began work in this field some time in October or the early part of November, 1891. It does not appear just when Owings and Lytle had their first negotiations

about leasing, but on December 18, 1891, the matter was closed, and Lytle executed to Snee the lease of that date, a copy of which is attached to plaintiff's bill. This lease was not signed by Snee until about the time of the filing of the bill in this case. The lease also contained the words, ' The test to be drilled on above described lease, or forfeit this lease.'

" Testimony was offered as to what was said at the time and immediately preceding the execution of the lease in explanation of this clause, but as there is a serious question as to its admissibility, the master will consider it hereafter.

" A well was to be completed within six months from date or a rental paid.

" The next event having any bearing on the matter was an agreement between Lytle and Jesse S. Wall, dated January 26, 1892, agreeing to convey five acres of his farm, being the tract upon which the Philadelphia Company is drilling its well, and the gas and oil rights in which are the subject of the present dispute. One hundred dollars of the purchase money was paid down and possession of the tract given to Wall. The article further contained the words, ' The party of the second part hereby covenants and agrees to take said five acres, more or less, subject to the lease of the Philadelphia Gas Company, now existing and in full force.' The words, ' Philadelphia Gas Company,' having been written by mistake of the justice of the peace, they were erased, and the words, ' John A. Snee,' written over them before the delivery of the article to Wall.

" Some time about the middle of May, 1892, Snee, who was also lessee of the Wright farm, a farm lying between Lytle and the river, began drilling a well thereon. This well, which turned out to be a large gas well, was completed on August 2d. It was, as has been stated, between the Lytle farm and the river, distant about half a mile from the nearest point of the Lytle farm, and about a mile and a half from where the well on his farm was afterwards located.

" On Tuesday, July 26, Lytle met Mr. Owings, the agent of Mr. Snee, and a conversation took place, which is not disputed, and which Lytle states was as follows: ' I asked him or told him I would like him to send me up the lease. He asked me why, and I told him the lease was dead and it was forfeited. Q. Did you tell him why the lease was dead? A. I don't mind

whether I told him why or not.  I made some remark about
not getting the well, and his answer then was, if I would
release he would give me the next well.   By the master:
Q. What was that?   A. He said, ' " I suppose you would not
hesitate to release if we would give you the next well ? " '

" On August 3d Owings again met Lytle, and it was arranged
that Mr. Snee should come personally and arrange for a new
lease.   Accordingly on the 8th of August Mr. Lytle met, and
a new lease bearing that date, and, as has been stated, exclusive
of the five acres sold to Wall, was executed, Snee paying Lytle
a bonus of one thousand dollars for the new lease.

" In the meantime, on August 5, 1892, John A. Snee had, by
deed bearing that date, acknowledged, on the 6th of August,
assigned to the Carnegie Natural Gas Company his right, title
and interest in thirty-two oil leases, including the Lytle lease
of December 18, 1891.

" On August 11, 1892, Snee, as contractor for the Carnegie
Natural Gas Company, proceeded to erect a derrick and drill
a well on the Lytle farm, which was completed on the 6th of
October.   Whether Lytle knew, or should have known, that
Snee was drilling this well for the Carnegie Natural Gas Com-
pany, and not for himself, is one of the disputed questions of
fact to be hereafter considered.

" On the 6th of October, 1892, Jesse S. Wall leased the five
acre tract above mentioned to the Philadelphia Company, and
the Philadelphia Company shortly thereafter proceeded to enter
upon said tract for the purpose of drilling a well, put up a der-
rick and commenced drilling, until stopped by the injunction
granted in this case.

" This covers the facts so far as they are not controverted,
and leads us up to the consideration of certain disputed mat-
ters upon which it will be necessary to formally find the facts.

" FINDINGS OF FACT.

" 1st. The first dispute arises over the contemporaneous con-
versations between Lytle and Owings at the time of the mak-
ing of the lease of December 18, 1891.

" The testimony of Lytle, at the most, simply amounts to
showing a promise on the part of Owings that he should have
the first well.   The legal questions involved can be discussed
hereafter.   For the present purpose the master may say that

the evidence sought to be introduced for the purpose of altering the written paper does not show fraud, accident or mistake, or a parol contemporaneous agreement on the faith of which the written instrument was executed. The fullest account Mr. Lytle gives is in his cross-examination, where he says that he and Owings went to the top of a hill and looked over towards the West Elizabeth field, and that Owings 'agreed that he would give me the first well if I leased.' ' Q. And then you executed the lease, did you, on that? A. We made some other arrangements and leased—not that day; he went home and came back the next day. Q. Then you say he simply agreed to give you the test well? A. Yes, sir.'

There are none of the elements here, even if the evidence was clear and undisputed, to change the terms of the writing. The master therefore finds:

" First. That there is not any evidence in this case of fraud, accident or mistake, or of a parol contemporaneous agreement, made at the time of the execution of the lease of December 18, 1891, and upon the faith of which the lease was executed.

" 2d. The next question which presents itself is whether or not the Wright well was a test of the Lytle farm. This in quiry may become important upon a consideration of the lan guage of the lease itself. The Wright well was between the Lytle farm and the Elizabeth field, and distant perhaps half a mile from the former. The evidence of the experts who testified can help us but little. It is doubtless true, as some of them said, that a producing gas well is not a certain test of anything except that gas has been found at that particular spot, aside from the question of construction as to what sort of a test was meant by the terms of the lease; [it would seem clear that in a commercial sense the Wright well was a test of the Lytle farm. It gave to that farm a market value which it did not have before.] [1] Prior to that time, according to all the evidence, this farm, as well as the neighboring ones, had but little value as gas or oil territory. There was a possibility that oil or gas might be found there, and the parties developing a neighboring field were willing to make the test. It had, however, no peculiar value as gas or oil territory. The Wright well changed the situation instantly. The Lytle lease, which had been hanging in abeyance for a few days, was at once closed

and a bonus of one thousand dollars paid for the new lease, the terms of which were stricter and the territory less by five acres than the former one. Under these circumstances the master finds:

"Second. That the well drilled on the Wright farm was a test of the Lytle farm as gas or oil territory, to the extent that by that well the Lytle farm was given a new and additional value for gas and oil development which it did not before possess.

"3d. An important question to be considered is that of the notice to Lytle of the claims of the Carnegie Natural Gas Company to a leasehold in his premises, and whether or not he had any notice of their rights under the lease of December 18, 1891.

"Mr. Lytle, under cross-examination by Mr. Packer, gives the date of his information on this subject. The substance of this testimony is that about the time the Carnegie Natural Gas Company commenced to drill on his place, that is about August 11, 1892, Lytle heard a report that this company had purchased the lease from Snee. This was a rumor in the neighborhood. So far as he can fix the date, Mr. Lytle says, ' I think it was after they commenced to drill there.' That his first actual knowledge that the Carnegie Natural Gas Company had taken an assignment of the lease was on October 14, 1892, when Mr. Clemson, an officer of the company, came there to locate a second well. Down until the meeting with Mr. Clemson Mr. Snee had charge of the work, and Mr. Lytle, except for the rumor in the neighborhood, did not know any one else as connected with or undertaking the work of development. There seems no reason to doubt Mr. Lytle's testimony in this respect. Mr. Packer called his attention to his deposition made at the time of the motion for the preliminary injunction, where, in answer to a question of Mr. Scott, as follows: ' Have you any knowledge or information when, if at all, any rights of the Carnegie Natural Gas Company were acquired in your land?' to which Lytle answered: ' I heard when they got the lease.' This question and answer are somewhat obscure. They would seem to mean that Lytle was informed at some time as to what was the date of the assignment to the plaintiff company. Mr. Packer, after reading the above question and answer, asks: ' Q. That is when you heard of the claim of the Carnegie Natural Gas Company? A. I heard it, yes, afterwards. I did not know it to

be the case to any certainty. I heard that report.' He further states that he made no inquiry of the company or its officers as to the truth of the report. This seems to be the synopsis of his testimony. Upon this the master finds:

" Third. That [Mr. Lytle heard a rumor, about the time of the drilling of the first well on his property, viz., on or about August 11, 1892, that the Carnegie Natural Gas Company had bought Mr. Snee's interest in the lease of his farm. He did not have actual or direct knowledge or notice of the assignment until October 14, 1892, when he was so notified by Mr. Clemson, an agent or employee of plaintiff company.] [3]

" 4th. There seems no dispute about the fact of the possession of the land down until the entry of Mr. Snee as contractor of the plaintiff company, nor of the five acres conveyed by article of agreement to Wall. These facts, however, for convenience, may as well be distinctly found. The master accordingly finds:

" Fourth. That Joseph Lytle was in complete and undisturbed possession of his entire tract of land, estimated at about four hundred acres, down to January 26, 1892, when he delivered possession under article of agreement of sale to Jesse S. Wall of the five acres in dispute. Lytle remained in possession of the remainder of the tract until August 11, 1892, when John A. Snee, contractor for the plaintiff company, entered and drilled a well thereon. Jesse S. Wall remained in possession of the five acre tract, as above mentioned, until August 6, 1892, or shortly thereafter, when the Philadelphia Company entered for the purpose of drilling a well thereon under a lease from Wall.

" 5th. As to notice directly to the Carnegie Natural Gas Company of the facts of forfeiture of the original lease and his action of taking the new lease of August 8th, it seems clear that the company did not have actual notice, nor did its attorney or officials know anything of these facts until the present controversy with the Philadelphia Company  Of course, in making this finding the master does not advert to any question of constructive notice, or whether the knowledge of Snee was knowledge of the company, as these are conclusions of law, to be drawn from the ascertained facts. The master accordingly finds:

"Fifth. That the Carnegie Natural Gas Company did not, through its attorney or officers, have actual notice or direct knowledge of the forfeiture of the first lease and the act of Snee in taking the lease of August 8, 1892, until some time in October of that year, when the defendant company was entering upon the five acre tract for the purpose of drilling thereon.

"CONCLUSIONS OF LAW.

"1st. The first question presented by counsel for defendant company is to the effect that the lease of December 18, 1891, was not binding upon either party to the contract; was, in fact, a mere nullity, because Snee, the lessee named therein, did not sign the lease until long afterwards. A consideration of the authorities on this question seems to result in a clear recognition of the principle that: 'Generally when a party who has not put his name to a written contract accepts it when signed and sealed by the other, it binds him the same as if he had executed it:' Jennings v. McComb, 112 Pa. 518; see, also, Grove v. Hodges, 55 Pa. 504.

"In addition to this we must consider the fact that Snee afterwards ratified the lease by signing it, and it is difficult to see how any third party could call into question the binding character of the contract thus made.

"The master, therefore, concludes that the lease of December 18, 1891, was binding on both parties in the same manner and to the same effect as though Snee had signed the lease at the time of its execution by Lytle.

"2d. The next question is the construction to be given to the terms in the lease of December 18, 1891: 'The test to be drilled on above described lease or forfeit this lease.'

"The master has already concluded under his first finding of fact that the parol testimony offered is not sufficient to modify or change the terms of the writing. The rule of law governing such questions is clearly stated in case of School Furniture Co. v. Warsaw School District, 130 Pa. 93. . . .

"This is so fully in line with the other authorities that it seems unnecessary to cite additional ones.

"Since then we must reject the parol testimony of the parties as to what they may have meant; we are thrown back upon the terms of the agreement itself, which, however, we are entitled to read in the light of the circumstances in which the parties themselves stood at the time they made it.

" As we have seen in the discussion of the facts of this case, the property in Forward township adjoining the Lytle farm was undeveloped for oil or gas at the time the lease was made. There were wells on the other side of the river in the West Elizabeth field, and there were wells near Monongahela City. A line joining these two might pass somewhere through this property. Still there had been no developments in the immediate vicinity which gave the property any peculiar value as to gas or oil territory.

" When Mr. Lytle contracted for a test.well to be drilled on his land, what did he mean ? for we are bound to give his words effect if we can do so. It seems to the master, though the question is not free from doubt, that [the intention of this clause was that a well which should test this property, which should give it a peculiar value as gas or oil property, should be drilled upon the leasehold itself.] [7]  As the master has found that this was not done, [he therefore concludes that there was, at the least, ground for the claim put forth by Mr. Lytle to Mr. Owings, that, not having given him the test well called for in the lease, the lease itself was forfeited, or, as he expressed it, ' dead.'] [9]

" 3d. It is claimed by counsel for plaintiff that the lease could not be forfeited because Lytle had parted with a portion of the reversion by his sale to Wall, and, therefore, neither Lytle nor Wall could declare a forfeiture of any estate in the entire tract.

" This proposition is based upon the fact that while under stat. 32, Henry VIII. c. 34, lessees and grantees, and their assigns, have the same right of entry and forfeiture that their grantors and lessors had, yet that this right is not apportionable.  The rule is thus stated by Washburn, Real Prop., vol. 1, p. 476 : ' But if he lease three acres, and then grant the reversion in two of these, it does not pass the benefit of the condition, because the condition is entire and indivisible, although the rent in such case will be apportioned.'

" Whether the rigor of the common law applies to this class of cases in Pennsylvania may be a subject of some doubt.

" In McKissick v. Pickle, 16 Pa. p. 149, Justice ROGERS says : ' The deed provides that the property shall revert to the party of the first part, and to his heirs and assigns. . . . That a grantor cannot reserve such a right will hardly be contended,

as in Pennsylvania there is no policy of law which forbids it. The law against maintenance has never been adopted in this state.'

"But whether or not this rule, as stated by Washburn, would be applied in a case where a re-entry was necessary in order to release a forfeiture, is hardly necessary to discuss at length.   There are two considerations which seem to take the present case out of the operation of the rule, assuming it to exist in the terms stated.   The first is that the grant to Wall was by articles of agreement; as to the five acres Lytle was still the legal owner, subject to Wall's right to compel a conveyance when the purchase money is fully paid.   The second is that, at the time when Lytle notified Owings, as agent of Snee, that his lease was 'dead,' Snee was not in possession, he had no estate in the lands, and his right was only that which Coke describes as an 'interesse termini.'

"In Sennett v. Bucher, 3 P. & W. 393, Justice ROGERS says: 'At common law no lease for years, whether it were with or without any reservation of rent, was looked upon as complete, till an actual entry by the lessee. . . . When a lessor fails to deliver the premises according to contract, the lessee has two remedies, either a suit against the lessor on his covenant, or he may, if he thinks proper, enter and recover the term.' . . .

"In legal contemplation the right to possession is in the lessor as against a third person, until the contract is consummated by the entry of the lessee.   When entry is made, such a right of possession is transmitted from the lessor to the lessee as will enable the latter to maintain ejectment, under the act of 1806 and at common law.'

"In Williams v. Downing, 18 Pa., at p. 63, Justice CHAMBERS says: 'At the common law no lease for years, whether it was with or without any reservation of rent, was looked upon as complete till an actual entry by the lessee; before such entry his right was called his interest in the term, or interesse termini.'

"From these considerations it would seem clear that [no entry or declaration of forfeiture was necessary on the part of Lytle to determine the rights of Snee in his land.] [10]   The relations of the parties at that time were entirely contractual. If Mr. Snee had performed his contract, or was ready to perform

it, he was entitled to enter on the Lytle tract, and, on the refusal of the owner of the land to permit him to enter, to sue him for a breach of contract. If, instead of taking this course, he deems it proper to make a new contract, this was entirely within the power of the parties to accomplish. It amounted to a rescission of the terms of the contract theretofore made between them, and which one of the parties declared to be at an end, and the making of a new one to take its place.

" The master accordingly concludes that [the action of Lytle in notifying his lessee that the lease was forfeited and at an end was substantially a declaration by him that he would refuse to give him possession of the tract therein described, and that when his lessee assented to this action and obtained from Lytle a new agreement of lease, he rescinded the former paper and virtually terminated all his rights thereunder. That the fact that Lytle had, after December 18, 1891, agreed to convey and deliver possession of a part of the tract mentioned in the lease of that date to Wall, did not prevent or alter the effect of the acts of the parties in surrendering the former lease and taking the new one.] [11]

" 4th. The question most strongly urged by the counsel for plaintiff, and apparently the real question in the case, is the effect of this rescission or forfeiture, whichever it may be called, of the first lease, and the taking of the new one. It would hardly seem to admit of argument that as to John A. Snee, when he acquiesced in Lytle's declaration that the lease of December 18th was at an end, whether Lytle was right or wrong as to the alleged ground of forfeiture, his rights under the old lease were at an end. The time for him to have asserted his rights was when Lytle confronted him with the declaration that he had not given him his test well, and that his lease was dead. When he entered into a discussion of new terms and conditions, and ended by taking a new agreement and paying an additional bonus, his actions forever closed his mouth from asserting any vigor or life in the former lease. But what effect did all this have upon his assignee, the Carnegie Natural Gas Company, who, in ignorance of what Snee was doing, were preparing to take possession, under the lease of December 18, 1891 ? Their claim is entitled to much consideration, for, as the master has found, they knew nothing of what was going on. The first

lease had been assigned to them, their agents entered on the land, drilled the well, and it was not till after all this was done and a large sum expended that they found that the lessor was treating them as in possession under another and later paper which they had never seen.

" While the case bears hardly upon them, the master is unable to see how they can have any relief for two reasons that to his mind are conclusive :

" First. The possession of Lytle, which was complete and undisturbed at the time the plaintiff company took their assignment of the lease from Snee, was notice to them of any title that Lytle might have or claim adversely to that paper.  The paper itself had upon it certain grounds of forfeiture.  It was the duty of the purchaser to ascertain from the party in possession whether the title which a person out of possession proposed to convey in his lands was what it purported to be.

" It was formerly held that a tenant in possession, where a lease was known to exist to him, was presumed to be in possession under the terms of that lease, and no further inquiry was necessary.

" In Leach v. Ansbacher, 55 Pa. 85, Justice THOMPSON there says: ' But nothing in the transaction gave the least sign to put the purchaser on inquiry.  The possession will, it is admitted ; but when the party is in possession under a lease the knowledge of the lease dispenses with the inquiry of how the possession is held.'

" This rule, although our courts have since gone beyond it, would be sufficient for this case, for here the tenant who sold the lease was not in possession, and the duty of inquiry therefore devolved on the purchaser.

" But in the recent and carefully considered case of Anderson v. Brinser, 129 Pa. 376, the dictum above given is overruled. There are two opinions in that case, one delivered upon the record presented after the first trial, the other after the second. In the first opinion Justice CLARK endeavors to explain the dictum as inapplicable ; in the second opinion, the facts on the second trial having somewhat changed, the dictum is distinctly disapproved.  He there says : ' Indeed, upon a somewhat careful examination of all the cases, we conclude that the language quoted from Leach v. Ansbacher is sustained neither by reason

nor authority.    Knowledge of the existence of a lease will, of course, give constructive notice of all its provisions ; but the possession, apart from the lease, we think should be treated as notice of the possessor's claim of title, whatever that claim may be, for the lease may be but the first of two or more successive rights acquired by the tenant.'

" [These authorities would seem to leave no option but to consider the occupation and possession of Lytle notice to the Carnegie Natural Gas Company of his denial of all rights under the first lease.] [15]

" Second.  The plaintiff company having obtained possession· by means of the second lease, cannot now claim by any other or different title than that under which they were admitted into possession.    The rule that a tenant cannot deny the title under which he obtained possession is well settled.    ' Perhaps no rule of law is better settled than that a tenant in possession under a lease shall not be allowed to dispute the title of his lessor.' Per PAXSON, J., in Mays v. Dwight, 82 Pa. 462.

" The reason of the rule is thus stated in Washburn on Real Property, vol. 1, p. 555 ; ' The policy of the law will not allow a tenant, under such circumstances, to be guilty of a breach of good faith in denying a title, by acknowledging and acting under which he originally obtained, and has been permitted to hold possession of the premises.'

" In Congregation v. Miles, 4 Watts, at p. 146, HUSTON, J., says : ' Good faith, honesty and the peace and order of the community require that he who has acquired possession under a contract not tainted by fraud, should not use that possession to the injury of him from whom he received it.'

" In commenting on this case Justice STRONG, in Erwin v. Myers, 46 Pa. 109, says : ' I do not understand that case to have decided this as a universal principle, or that it goes any further than to rule that a party cannot rescind the contract and still retain the possession taken under it.'

" The reason of the rule seems broad enough to cover this case.    The plaintiff company obtained possession of the land under the lease of August 8, 1892.    True, they supposed they were going in under the former lease, but the agent who entered to put up the derrick was the same man who had taken the second lease for the very purpose of obtaining possession.

So far as the landlord was concerned he knew only Snee in the transaction. It was Snee to whom he had leased, and Snee who came with the workmen to erect the derrick. Snee, by means of the second lease, obtains the right to go upon the land. He makes his entry and starts the work of developing the property. Through the door which he opened, the other agents and employees of the plaintiff company entered at will. [It seems clear that the possession of the plaintiff company was taken and held under the lease of August 8, 1892.] [5]

" The master, therefore, concludes upon this branch of the case that the rights of the Carnegie Natural Gas Company in the premises do not rise any higher than that of their assignor, John A. Snee, and they are bound by his surrender of the old lease and acceptance of the new, for the reason that the possession of Lytle of the tract described in the lease of December 18, 1891, was notice to the assignees of any rights or equity he might have outstanding against said lease, and that the plaintiff company, obtaining possession under the terms of the lease of August 8, 1892, are concluded by its terms.

" 5th. While the questions just considered are the really controlling ones in the case, yet one or two subsidiary ones remain. One of these is that suggested by plaintiff's counsel that a parol surrender of the lease of December 18th was not good. This position can hardly be sustained in view of the case of Auer v. Penn, 92 Pa. 444. Justice MERCUR there says: ' The fact that a lease is for a longer term than three years does not prevent a rescission thereof by agreement of the parties when accompanied by a surrender of the term and possession by the tenant to the landlord, and the acceptance thereof by the latter. . . . It is a yielding up to the reversioner the limited estate derived from him, whereby the future tenancy is rescinded. The relation of landlord and tenant is thereby ended.'

" The master is, therefore, of opinion that the surrender by Owings as agent of Snee of the first lease, coupled with the fact that Snee ratified this act by taking a new lease of the same tract, except five acres, on different terms and conditions, and with the further fact that possession had never been taken under the first lease, was a good surrender, or rescission of the contract contained in the first lease.

" 6th. Another question suggested is whether or not Lytle had

constructive notice that the right of the Carnegie Company had vested in the first lease, and was, therefore, estopped from asserting his forfeiture of that lease in the hands of Snee. The evidence on this point has already been considered. There is no dispute of the fact that Lytle did not have any direct information or notice from any officer of the company until long after possession had been given, that is, about the time the first well came in. Before that he had heard a rumor or report that the plaintiff company had bought Snee's interest. Just when he heard this rumor is not exactly stated, nor does it seem to to be material.

"Justice GREEN, in Hottenstein v. Lerch, 104 Pa. St., at page 460, states the rule : 'In this class of cases it is well settled that a party is not affected by a mere general rumor, and the notice of such rumor is neither actual nor implied notice of the existence of such a title. It is also held that the information must come from some person interested in the property, and must be directly communicated to the party sought to be affected.'

"The master, therefore, does not view any rumor which Lytle may have heard at any time as to the real ownership of the lease he had given, as amounting to actual or constructive notice of the rights of any other party therein.

"7th. The defendant's counsel have raised the question of jurisdiction, contending that the plaintiff has his remedy in ejectment. While the earlier cases are, perhaps, not altogether in harmony, the effect of the later cases is to distinctly sustain jurisdiction in a case of this sort, where the lease granted is not a conveyance in fee, but amounts, at the most, to an incorporeal hereditament : Funk v. Haldeman, 53 Pa. 229 ; Union Petroleum Co. v. Bliven Petroleum Co., 72 Pa. 173 ; Hancock v. McAvoy, 31 W. N. 257.

"The master, therefore, concludes that a court of equity has jurisdiction of this suit.

"These appear to be all the legal questions of importance raised on this record. In reaching a final conclusion as to the disposition of the case, the master would say, that while he has endeavored to weigh and consider carefully the questions presented by counsel as to the effect of the parol evidence, the construction of the lease, the grounds of forfeiture, and others

of a similar nature, yet to his mind the real question presented here is within very narrow limits, and depends upon the view to be taken of the effect upon the rights of the plaintiff company of the acts of their assignor in rescinding his contract, already assigned to them, before either he or they had entered into possession thereunder. This question has already been discussed, and the master only refers to it here as indicating his belief that it is the pivotal question in the case, and the plaintiff company must stand or fall according to the final adjudication of this point. Upon the authorities the master has referred to, he sees no alternative but to conclude that when the plaintiff company took the lease of December 18, 1891, they took with constructive notice of any equities or defences thereto which might have been revealed by an inquiry of the party in possession, and that when they entered upon the property they did so under and by force of the lease of August 8, 1892, which they cannot thereafter, so long as they hold possession, deny."

Exceptions to the master's report, among others as in brackets, were dismissed in the following opinion by EWING, P. J.:

" The defendant company was bound to know and did know of the lease of Lytle to Snee, December 18, 1891. If that lease was not forfeited the plaintiff, as assignee of Snee thereunder, is entitled to the exclusive right to bore for oil and gas on the five acres Lytle sold to Wall and Wall leased to the defendant company, October 6, 1892. If the lease of December, 1891, was forfeited the right is with the defendant.

" The lease from Lytle to Snee was taken by Owings, Snee's agent. Snee did not sign the lease until after this suit was brought; he did not, so far as the testimony shows, do anything to expressly bind himself to its conditions, or offer to do anything until Lytle had, on July 26, 1892, notified Owings, as agent for Snee, that the lease was forfeited; nor until August 3d, after the Wright well had proved a success, when Owings, as his (Snee's) agent, tendered rent to Lytle on account of the lease which Lytle claimed was forfeited and refused to take the money.

" On the 5th of August, Snee assigned the Lytle lease, inter alia, to the plaintiff company. That lease on its face contained notice of liability to forfeiture, for two causes. The assignee was bound at its peril to ascertain whether or not it had been

forfeited. The leases assigned as a part of the same transaction showed that Snee had leased a large amount of land in the district, which they knew was undeveloped and untested for oil or gas until the Wright well was completed, August 2, 1892. Neither Snee nor any one under him ever entered into possession under the lease of December 18, 1891. Snee, on the 8th of August, 1892, in accordance with a previous arrangement, and by Owings, his agent, came to the farm and made a new lease with Lytle, excluding therefrom the five acres sold to Wall.

" There are three distinct acts or declarations of forfeiture made by Lytle. 1st. His declaration to Owings as agent of Snee, July 26th, and his request that the lease be surrendered to him. 2d. His refusal to accept rent, August 3d, for the reason that the lease was forfeited. 3d. The executing a new lease to Snee with a new consideration August 8th.

" It is claimed by counsel for the plaintiff that this last lease was void and of no effect as to the plaintiff, for the reason that three days before Snee had assigned his old lease. No notice was given to Lytle then, nor for a long time thereafter, of any claim of ownership; the lease and assignment were not on record. As an act on part of Lytle made to the lessee and ostensible owner of the old lease, the new lease was an emphatic declaration of forfeiture of the old lease. Snee made this new lease on favorable terms, and then as agent or employee of the Carnegie company, without notice from any one of the assignment to the plaintiff, entered on the land for the first time and began to bore for gas.

" The master finds that the plaintiff company and its agents were ignorant of the new lease. The only evidence of that fact is the absence of direct testimony to the contrary. Assuming that Snee and the officers of the Gas Company were neither stupid nor dishonest, the presumption is strong that Snee acted for the Carnegie Company in taking the new lease. The new lease was clearly a good arrangement for the Gas Company, to whose benefit it would inure whether Snee in taking it acted with or without instructions.

" Was the lease forfeitable on the ground on which Lytle undertook to forfeit it? It is contained in this stipulation, ' The test to be drilled on the above described lease or forfeit this lease.'

" The other ground of forfeiture contained in the lease is, a failure to begin operations within six months or pay the rental specified when due ' will render the lease null and void.' This latter clause clearly refers to the Lytle lease, above. We can see no shadow of ground for the claim of plaintiff's counsel that ' the test to be drilled on the above described premises ' means the test of the Lytle farm alone ; that meaning is clearly excluded by the whole lease.

" Given the fact that the neighborhood was untested territory, or even without it, no one familiar with the methods pursued in leasing and operating such territory for oil or gas would have any doubt that it referred to and means a test of the oil or gas producing quality of the land in the vicinity.

" The master properly admitted testimony to show the situation in this respect. He might have properly gone further and admitted and considered testimony which he rejected. It is not testimony in contradiction of the written agreement ; it is in explanation of that which, to one unfamiliar with the situation and the business of developing untested territory, might otherwise be ambiguous.

" We are of the opinion that the master has correctly found that the test referred to was a test of the vicinity of untested territory, that the Wright well was such test drilled on another lease, and that the failure to drill this test on the Lytle lease was a cause of forfeiture stipulated in the lease."

*Errors assigned* were dismissal of exceptions, and entry of decree, quoting them.

*Gibson D. Packer*, for appellant, cited : Sherman v. Kittsmiller, 17 S. & R. 45 ; Ballou v. March, 133 Pa. 64 ; Patterson v. Silliman, 28 Pa. 313 ; Maginnis v. Thompson, 29 Pitts. L. J. 336 ; Brownback v. Ozias, 117 Pa. 87 ; 1 Wood's L. & T. pages 453, 1158, 1207 ; West. Nat. Gas Co. v. DeWitt, 130 Pa. 235 ; Zoebisch v. Rauch, 133 Pa. 537 ; Dumn v. Rothermel, 112 Pa. 281 ; Phillipsburg Savings Bank's Ap., 10 W. N. 265 ; 1 Washburn on Real Property, page 476 ; Doe v. Edwards, 5 B. & Ad. 1065 ; Steckel v. Desh, 12 W. N. 130 ; Thompson v. Christie, 138 Pa. 230 ; Beidelman v. Foulk, 5 Watts, 314 ; Fisher v. Knox, 13 Pa. 622 ; Miller v. Browarsky, 130 Pa. 372 ; Logan

v. Gardner, 142 Pa. 442; Greene v. Fire Ins. Co., 91 Pa. 387; Cramer v. Bank, 2 Grant, 267; Thompson v. Clark, 7 Pa. 62; Mays v. Dwight, 82 Pa. 462; Herman on Estoppel, par. 841; Scott v. Gallagher, 14 S. & R. 333; Koon v. Tramel, 71 Iowa, 136; Sprague v. White, 73 Iowa, 670; Tuttle v. Churchman, 74 Ind. 311; Bloomer v. Henderson, 8 Mich. 395; Dawson v. Bank, 15 Mich. 489; Carnarvon v. Villebois, 13 M. & W. 342; Smith's L. & T. 231; Woodfall's L. & T., 299; Meehan v. Williams, 48 Pa. 241.

*William Scott, John Dalzell* and *George B. Gordon* with him, for appellee, cited: Centenary Church v. Clime, 116 Pa. 146; Bertsch v. Lehigh Coal & Nav. Co., 4 Rawle, 130; McCullough v. Wainright, 14 Pa. 171; Barnhart v. Riddle, 29 Pa. 92; Chalfant v. Williams, 35 Pa. 212; Aldridge v. Eshleman, 46 Pa. 420; Graver v. Scott, 80 Pa. 88; Clark v. Adams, 83 Pa. 309; Morris's Ap., 88 Pa. 368; Berridge et ux. v. Glassey, 112 Pa. 442; Lehigh Coal & Nav. Co. v. Harlan, 27 Pa. 439; Aldridge v. Eshleman, 46 Pa. 420; Clarke v. Adams, 83 Pa. 309; Dubois v. Bigler, Young & Co., 95 Pa. 203; Brown v. Vandergrift, 80 Pa. 142; Munroe v. Armstrong, 96 Pa. 307; McKissick v. Pickle, 16 Pa. 140; Hamilton v. Elliott, 5 S. & R. 375; Kenrick v. Smick, 7 W. & S. 41; Sheaffer v. Sheaffer, 37 Pa. 525; Ray v. Gas Co., 138 Pa. 576; Bradlee v. Whitney, 108 Pa. 362; Jacques v. Weeks, 7 Watts, 267; Barnes v. McClinton, 3 P. & W. 67; Knouff v. Thompson, 16 Pa. 357; Hood v. Fahnestock, 1 Pa. 474; Hill v. Epley, 31 Pa. 331; Gibson v. Winslow, 46 Pa. 380; Crest v. Jack, 3 Watts, 240; Carr v. Wallace, 7 Watts, 401; Auer v. Penn, 92 Pa. 444; McKinney v. Reader, 7 Watts, 123; Reeve v. Bird, 1 C. M. & R. 31; Dodd v. Acklom, 6 M. & Gr. 679; Kiester v. Miller, 25 Pa. 483; Karns v. Tanner, 66 Pa. 297; Barker v. Dale, 3 Pitts. R. 191; Milling v. Becker, 96 Pa. 185; Dos Santos v. Hollingshead, 4 Phila. 57; Phene v. Popplewell, 12 C. B. (N. S.) 334; Woods v. Farmere, 7 Watts, 382; Hottenstein v. Lerch, 104 Pa. 454; Anderson v. Brinser, 129 Pa. 376; Richards v. Elwell, 48 Pa. 361; Harris v. Harris, 70 Pa. 170; High on Injunctions, §§ 652, 732; N. P. Coal Co. v. Snowden, 42 Pa. 488; Grubb's Ap., 90 Pa. 229; Ferguson's Ap., 117 Pa. 426; Duncan v. Iron Works, 136 Pa. 478; Thomas v. Hukill,

131 Pa. 298; Pitts., etc., Drove Yard Co.'s Ap., 123 Pa.
250; Duncan v. Iron Works, 136 Pa. 478; Turner v. Reynolds,
23 Pa. 199; Chicago Co. v. U. S. Petroleum Co., 57 Pa. 83;
Kitchen v. Smith, 101 Pa. 452; Duke v. Hague, 107 Pa. 57;
Titusville Iron Works' Ap., 77 Pa. 103; Sheets v. Allen, 89
Pa. 47; Brown v. Vandergrift, 80 Pa. 142; Thompson v.
Christie, 138 Pa. 23; Truby v. Palmer, 4 Cent. R. 925; Mun-
roe v. Armstrong, 96 Pa. 307; Union Petroleum Oil Co. v.
Bliven Petroleum Co., 72 Pa. 173.

PER CURIAM, November 6, 1893:

There appears to be no error in the conclusions reached by
the learned master and the court below; and the decree may
well be affirmed on the report of the former and the opinion of
the latter.

Decree affirmed and appeal dismissed with costs to be paid
by appellant.