## J. W. Smiley, Appellant, *v.* J. E. and William Gallagher, and J. R. Gallagher and James O'Donnell.

*Contract—Evidence—Lease—Presumption.*

Plaintiff and the three defendants were lessees in an oil lease. Plaintiff claimed a one fourth interest. An agreement was offered in evidence signed by the three defendants, but not by the plaintiff, by which it appeared that one of the defendants was to have a one eighth interest. There was also evidence tending to show that there was a prior parol agreement, by which plaintiff was entitled to one half of the one eighth interest held by one of the defendants. *Held*, that the evidence was sufficient to overcome the presumption arising from the lease that the parties were to share equally, and that plaintiff was entitled to one sixteenth interest only.

Argued Oct. 16, 1894. Appeal, No. 156, Oct. T., 1894, by plaintiff, from decree of C. P. Washington Co., Feb. T., 1894, No. 838, in equity. Before STERRETT, C. J., GREEN, WILLIAMS, McCOLLUM, MITCHELL, DEAN and FELL, JJ. Affirmed.

Bill in equity for an account.

The following opinion was filed by McILVAINE, P. J.:

" J. W. Smiley, plaintiff, in his bill, claims :

" 1st. That he is the owner of an undivided one fourth interest in a certain oil and gas lease ; that the lease was made Sept. 23, 1893, by J. C. and K. Noble McDonald to J. E. and Wm. Gallagher, James O'Donnell and J. W. Smiley as tenants in common, and granted to them as lessees the privilege of mining for oil and gas on ten acres of land situate in Mt. Pleasant township, Washington county, for a period of three years, or so long as oil or gas are produced in paying quantities, they, the lessees, agreeing to drill two wells within one year from the date of said lease ; to give the lessors a fixed proportion of the oil produced, a stipulated price for each gas well and $1,000 bonus, $500 to be paid when the lease was delivered and the remaining $500 to be paid out of the first oil produced.

" 2d. That he and defendant have taken possession and have drilled and completed two wells, both of which are producing oil at the rate of 150 barrels per day, and, at the time of filing this bill, 1700 barrels of oil had been run from said wells into the pipe line tanks.

" 3d. That no understanding or arrangements have been made between himself and his cotenants as regards the expenses of drilling said wells, and that no division order has ever been signed by them and filed with the pipe line company for the oil that has been run into the tanks and that may hereafter be run into the company's lines.

" 4th. That he was not a party to the contract made with the person who drilled said wells, said contract having been made by Wm. and J. E. Gallagher ; that said contractors have not been paid, and that the contractor who drilled the first well has issued a foreign attachment against J. E. and Wm. Gallagher of Olean, N. Y., and attached their interest in all the machinery and oil in and about said leasehold and oil run into the pipe line company.

" 5th. That he has already contributed to his share of the expenses of procuring said lease and drilling and operating said leasehold the sum of $500, and is ready and willing to pay his full proportional share of the expense.

" 6th. That J. E. and Wm. Gallagher, on Nov. 4, 1893, sold, transferred and assigned their interest in said leasehold to J. R.

Gallagher, who is now liable for his proportionate share of the expenses of operating said leasehold.

" 7th. That his, plaintiff's, interests are being jeopardized by the defendants in their manner of operating said leasehold and refusing to pay their contractors.

" 8th. That J. E. and Wm. Gallagher and their assignee J. R. Gallagher have sold 1700 barrels of oil run from said wells without his consent, and have failed to render any account to him or to give any account of the use to which said money was placed.

" He prays that the court may decree : (1) Who are co-tenants with him, and the proportionate interest of each of said cotenants in said leasehold, machinery and oil produced from said leased premises. (2) To account between the parties. (3) That a division order may be made in accordance with the proportionate share of each owner. (4) General relief.

" The defendants in their answer admit :

" 1st. That the lease was taken by the plaintiff and J. E. and Wm. Gallagher and James O'Donnell, from J. C. and K. Noble McDonald, and its terms.

" 2d. That J. E. and Wm. Gallagher have had two wells drilled on said leased premises and that oil has been produced in paying quantities, but deny that plaintiff has contributed to the expense of drilling said wells and that the contractors have not been paid (except as to a disputed bill), and that they have been managing the operations of the lease improperly.; on the contrary they allege they have managed and conducted the operations of the leasehold in the best manner, and successfully, while the plaintiff has neglected to do anything towards assisting in its operation, and that there is no money coming to him after his dues and share of the expenses have been paid out of the receipts from oil sold.

" 3d. They deny that the plaintiff is the owner of an undivided one fourth interest in said leasehold and wells, and allege that he is the owner of but an undivided one sixteenth interest or an equal owner of an undivided one eighth with one of the defendants, James O'Donnell.

" Other denials and allegations are made in the answer, but we have stated all that is necessary to state, as the case is now before us.

" To this answer the plaintiff filed a replication, and we have, for present determination, the issue : 1. What is the interest of plaintiff in said leasehold, and the oil produced from the leased premises, and, 2, Is he entitled to an account.

" J. W. Smiley is superintendent of the Belmont Oil Company, and James O'Donnell is a tank gauger, and both live in the McDonald oil field near the premises operated in the lease in question.   J. E. and Wm. Gallagher are residents of Olean, N. Y., and are oil producers and operators, and have been in the business in the McDonald field from sometime before Sept. 23, 1893.   O'Donnell and Smiley, who were not operators or producers but who occasionally took oil and gas leases with the purpose of having them developed by other parties, learned that ten acres of land belonging to the McDonald Bros. could be leased for $1,000 bonus and the usual royalty.   They sought out some one who was able and willing to operate this piece of land, if a lease should be obtained upon it.   They and the Gallagher Bros. finally came together and agreed to take a lease from the McDonald Bros.

" On Sept. 14, 1893, O. R. Cook, Esq., prepared a lease and it was signed by J. C. and K. Noble McDonald and J. E. and Wm. Gallagher, and left the lease in his office for the signatures of O'Donnell and Smiley who were not present, and that same day the following paper was prepared by Mr. Cook :

" ' Articles of Agreement made and entered into this 14th day of September A. D. 1893, by and between Gallagher Bros. of Olean, in the state of New York, parties of the first part, and James O'Donnell parties of the second part, as follows, to wit :

" ' Whereas, the said parties to this agreement have leased for oil and gas purposes from J. C. and K. Noble McDonald a certain tract of land situated in Mount Pleasant Township, in the County of Washington and State of Pennsylvania, near Primrose Station, containing ten acres, said lease being dated September 14th, A. D. 1893 :

" ' Now therefore this agreement witnesseth that the said party of the first part agrees to drill at their own proper cost, the first well to be drilled on said premises as provided in said lease and to furnish all material necessary to complete said well and to give or allow to the said party of the second part a full equal one eighth interest in said first well.

" ' In consideration whereof the said party of the second part agrees to pay the one thousand (1000) dollars bonus as provided for in said lease, that is to say, five hundred (500) dollars in cash and the remaining five hundred (500) dollars out of the share of production first set apart to the said party of the second part. The said party of the second part also agrees to pay their proportionate share of the running expenses of said first well after the same has been completed, and also their proportionate share of the cost and expense of drilling and operating any well or wells that may be drilled on said premises after the said first well.

" ' In witness whereof the said parties of the first part and second part have hereunto set their hands and seals the day and year aforesaid.'

" In witness whereof this paper was signed and sealed by Gallagher Bros. and James O'Donnell some time before Sept. 23, 1893.

" On the last mentioned day the parties were at Mr. Cook's office to close up the matter ; when it was discovered that the lease, written Sept. 14, 1893, and partly executed, contained a mistake in the description that might lead to a misunderstanding between the parties, the lease was rewritten and there signed by all the parties.

" The Gallagher Bros. took possession under the lease and commenced operations ; at the time this bill was filed had completed two wells which were producing considerable oil and are now drilling a third well. Neither Smiley nor O'Donnell have taken any active part in the operations upon this lease but have allowed the Gallagher Bros. to make the contracts and drill and operate the wells, which, so far as the testimony shows, was done in their own name, at least Mr. Smiley says he had no part in making the contracts for the development of the territory. No division order has ever been signed by the parties interested and given to the pipe line company ; that is, no division of the oil produced has been agreed upon in writing and filed with the company and no settlement has been made as to the expenses incurred by the Gallagher Bros. in operating the lease, at least so far as the plaintiff is concerned.

" All that Smiley ever paid on account of the lease and its development was the $250 to the McDonald Bros., his half or

share of the bonus which had to be paid when the lease was executed, and the Gallaghers have never paid anything on account of money received from oil produced and sold.   By reason of a written notice served by Smiley upon the pipe line company, one fourth of the oil now being produced is held by the pipe line company subject to a determination of this suit.   The exact amount of oil that has been produced from the leased premises and the exact amount of money expended in operating does not appear in the pleadings or testimony, nor does it appear how much of the expenses incurred has not been paid by the Gallagher Bros.; in other words the account between the tenants in common, the plaintiff and defendants, is open and unsettled and if the parties cannot agree on a settlement will have to be stated by the court upon a further hearing.   The questions now before us are preliminary, and must be determined before an account is stated: Collyer v. Collyer, 83 Pa. 257; we must first determine the extent of the plaintiff's interest, and to this question we will now turn our attention.

" J. W. Smiley testified that prior to the execution of the lease of Sept. 23, 1893, he and O'Donnell had an agreement with the Gallagher Bros. that they were to pay the bonus money and that this was to stand as that much put into the operation of the lease by them (the Gallaghers), in other words, that the four lessees were to be equal owners in the leasehold and in drilling for oil and gas,' or, to use his own words, he was to be let in on the ground floor; every dollar of his money was to be as good as what they would put in.

" The Gallaghers deny this and say that they agreed to operate the lease and carry a one eighth interest in the first well for O'Donnell and Smiley free of cost, if they would pay in cash the first half of the bonus and allow the other half to be paid out of their oil, and that, in other wells drilled, if oil was found, they (O'Donnell and Smiley) should have a one eighth interest between them but should pay their proportionate share of the expenses, and that this verbal agreement, made before this lease was executed, with both O'Donnell and Smiley, was reduced to writing by Mr. Cook at their instance and was signed by O'Donnell, but that Smiley omitted to sign it, not, however, repudiating the verbal contract until some time after the lease had been executed and operations commenced.   The

only corroboration of Mr. Smiley's version of the contract is found in the lease which is made to four persons, and the presumption is that each had an equal interest in the leasehold estate thereby created. But a knowledge of the oil business, the manner in which leases are taken and working interests in wells are carried, and the fact that the consideration is a royalty of the oil produced by labor bestowed upon the leasehold, to some extent weakens this presumption, and it is not as strong as where land is conveyed in fee simple for a fixed sum, which, on the face of the deed, appears to have been paid by all the parties jointly. In such a case equality of ownership arises out of the supposition that each party paid an equal part of the purchase money, but the privilege to drill for oil or gas may be, and usually is obtained on the covenants of the lease ·to deliver a certain proportion of the oil produced, and the expenditure of money by the lessees in operating the lease ; and the proportion each puts in for this purpose is frequently made the basis for calculating their respective interests in the production. But over against this presumption, giving it full weight, and the testimony of the plaintiff, we have the testimony of the two Gallaghers corroborated by that of James O'Donnell and Edward Morely, and the weight of the testimony as a whole is clearly against the plaintiff.

"It is very evident from the testimony, and is not seriously disputed, that the purpose of O'Donnell and Smiley in this and other leasing ventures was to take a lease and then have some producer who had money to develop it, they retaining as large a working interest as possible, which was to be carried by the operators in the first well; then, if the first well was good, their interest would enable them to carry for themselves their interest in succeeding wells ; and if the first well was dry the operators would be out all the expenses of drilling the first well, and they would be out only what it cost to get into the lease.

"Such contracts are common. Smiley, himself, admits enough to show that he and O'Donnell, of the one part, and the Gallagher Bros., of the other part, had some kind of a contract between themselves in reference to taking and operating this lease, and that part of that contract was that he and O'Donnell should pay in cash, when the lease was executed, $500 of the bonus

then due, and that the Gallagher Bros. should pay nothing. It is true that Smiley says that this was done because the Gallaghers then had no ready money and that they were to put that much more into the expenses of drilling the first well, and thus put them on an equality as owners and operators of the lease, but this version of the transaction is inconsistent with the fact that Smiley and O'Donnell borrowed of the Gallagher Bros. $167 to pay this $500, and afterwards paid it back to them, which they did, as clearly appears from the testimony.

" Again, [the testimony of Edward Morely shows that O'Donnell and Smiley were working together as contracting parties, as against the Gallagher Bros., and that the four lessees, in this lease, did not expect to go in as equal owners in the lease and its operation.] [3]   The contract which O'Donnell admits, and which was afterwards put in writing, is consistent with the other facts in the case, while Smiley's claim is inconsistent. We have no doubt that [he made the same agreement with the Gallaghers that O'Donnell did,] [4] that when the lease was executed and delivered by the McDonald Bros. to the four lessees, this contract between them existed, [and that Smiley, when he refused to sign the writing that O'Donnell signed and denied the agreement therein set forth, was already bound by a verbal contract, the terms of which are the same as that contained in the writing signed by O'Donnell,] [4] and which, having been acted upon by the Gallaghers, could not be repudiated by him.

" It was argued that the contract signed by O'Donnell was unfair in its terms.   Granting that it is, the plaintiff cannot now change it if he once was a party to it, so as to make it more favorable to himself.   The only relevancy that the terms of the two contracts set up have to the question in dispute is the bearing they would have on the probability that the parties would enter into such a contract as is averred by defendants.

" If the terms of a verbal contract which was admittedly made are disputed by the contracting parties, and the evidence is evenly balanced, the terms that are most just and equitable should prevail.   But in this case [the contract was in regard to a matter that was speculative and full of contingencies, and whether the contract, as alleged by the defendants, was favorable or unfavorable to Smiley and O'Donnell depends on circumstances to be developed in the future.] [5]   If Gallagher

Bros. should have been required to spend $5,000 in drilling the first well (and they say this is not an unreasonable estimate), and the lease should have proved worthless, they, the owners of the seven eighths interest would have lost $5,000, while O'Donnell and Smiley, owners of their one eighth would have lost only $500, whereas, if they (O'Donnell and Smiley) were owners of one half of the well, they would have had to pay one half of the $500 bonus and one half of the $5,000 expended in drilling the well, and lost it all; or granting that they owned the one eighth together, and Gallaghers seven eighths, each .lessee to share in paying the bonus and the expense of drilling the well, then they would have had to pay one eighth of the bonus, $62.50, and one eighth of the expense, $625, or in all $787.50, in place of the $500 which they paid to be carried free, so the advantage of the bargain depended on what it would cost to drill the first well and whether oil would be found or not, and, if oil was found, how much; things unknown when the bargain was made. The way this venture turned out it may be that the Gallaghers had the best of it. But it might have turned out so that the bargain made would have been most advantageous to O'Donnell and Smiley. The terms of the O'Donnell contract therefore throw no light on the question, whether it was also joined in by Smiley or not.

"On Nov. 21, 1893, J. E. and Wm. Gallagher assigned their interest in the lease to J. R. Gallagher of Olean, N. Y., but continued in the management of the leasehold.

"And now, April 17, 1894, this cause came on to be heard before the said court: the parties plaintiff and defendant being present and represented by counsel, the testimony and evidence, on the part of the plaintiff and defendants, being. taken before and submitted to the said court, and the arguments of counsel having been heard, upon consideration hereof, it is ordered, adjudged and decreed as follows, to wit:

"1st. [That the plaintiff, J. W. Smiley, is the owner of an un· divided one sixteenth interest in the leasehold in question, and the oil and gas produced therefrom ; and that his liability for expenses incurred in procuring the lease and operating it, and his rights in the premises are to be considered and determined in an account render the same as though he had signed with James O'Donnell the contract evidenced by Exhibit ' A,' attached to and made part of the defendant's answer.] [1]

" 2d. [That the owners of said lease and wells from Sept. 23, 1893, were J. W. Smiley, one sixteenth ; James O'Donnell, one sixteenth ; J. E. and Wm. Gallagher, seven eighths; and after Nov. 24, 1893, J. W. Smiley, one sixteenth ; James O'Donnell, one sixteenth ; and John R. Gallagher seven eighths.] [2]

" 3d. That the defendants render an account to the plaintiff of all oil and gas produced·from and out of the said leasehold and the wells thereon, from Sept. 23, 1893, to the present time, and the cost and expense in the operations upon said leasehold under the said lease during the said time and file the said account in the said court in the above entitled case, within 15· days from this date, to be passed on by this court."

*Errors assigned* were (1–5) above findings in brackets, quoting them.

*W. G. Crawford, J. M. McBurney* with him, for appellant.— There was not sufficient testimony to connect plaintiff with the agreement of Sept. 14, or to overcome the presumption of equality arising from the lease.

*W. S. Miller* and *J. W. McDowell,* not heard, for appellees.— The finding of facts by a master, approved by the court below, will only be set aside for plain error: Kisor's Ap., 62 Pa. 428 ; Phillip's Ap., 68 Pa. 130 ; Sproull's Ap., 71 Pa. 137 ; Stocker v. Hutter, 134 Pa. 23 ; Kirby v. Bradford Co., 134 Pa. 111.

PER CURIAM, Oct. 29, 1894:

All the specifications relate to alleged errors in the learned judge's findings of fact. We have examined the record with special reference to the several specifications, and are not convinced that there is any error in either of them that requires either reversal or modification of the decree.

Decree affirmed and appeal dismissed with costs to be paid by appellants.