# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| Pennsylvania Environmental Defense Foundation, | : | |
| | : | |
| Petitioner | : | |
| | : | |
| v. | : No. 228 M.D. 2012 |
| | : Argued: December 12, 2018 |
| Commonwealth of Pennsylvania, and Governor of Pennsylvania, Thomas W. Corbett, Jr., in his official Capacity as Governor, | : | |
| | : | |
| Respondents | : | |

BEFORE:    HONORABLE MARY HANNAH LEAVITT, President Judge
                     HONORABLE RENÉE COHN JUBELIRER, Judge
                     HONORABLE ROBERT SIMPSON, Judge
                     HONORABLE P. KEVIN BROBSON, Judge
                     HONORABLE ANNE E. COVEY, Judge
                     HONORABLE MICHAEL H. WOJCIK, Judge
                     HONORABLE ELLEN CEISLER, Judge

OPINION BY JUDGE WOJCIK                                    FILED: July 29, 2019

This case returns to us following the Pennsylvania Supreme Court's remand in *Pennsylvania Environmental Defense Foundation v. Commonwealth*, 161 A.3d 911 (Pa. 2017) (*PEDF II*). Before this Court for disposition are the parties' cross-applications for summary relief in this declaratory judgment action filed in our original jurisdiction.[1] Petitioner Pennsylvania Environmental Defense Foundation (the Foundation)[2] and Respondents Commonwealth of Pennsylvania

---

[1] This Court has original jurisdiction pursuant to Section 761(a) of the Judicial Code, 42 Pa. C.S. §761(a).

[2] The Foundation is an environmental advocacy entity.

and Tom Wolf in his official capacity as Governor of Pennsylvania (collectively, Commonwealth) seek declaratory relief under the Declaratory Judgment Act[3] as to whether money received from payments due under leases for the extraction and sale of oil and gas on State forest lands, including bonuses and annual rental payments, are part of the corpus of the environmental public trust established by Article I, Section 27 of the Pennsylvania Constitution (Environmental Rights Amendment), and if so, whether various fiscal enactments appropriating those funds for non-trust purposes are unconstitutional under Section 27. The Foundation argues that bonuses and rental payments are part of the corpus trust; the Commonwealth argues that they are not. For the reasons that follow, we grant the Commonwealth's application upon determining that one third of the proceeds constituting bonuses and rental payments are not part of the corpus trust, and thus, the challenged fiscal enactments are not facially unconstitutional. We deny the Foundation's application.

## I. PROCEDURAL HISTORY

We begin by summarizing the Supreme Court's opinion in *PEDF II* and its directives to this Court on remand.[4] In *PEDF II*, the Supreme Court

---

[3] 42 Pa. C.S. §§7531-7541.

[4] As this Court has explained:

> "[I]t has long been the law in Pennsylvania that following remand, a lower court is permitted to proceed only in accordance with the remand order." *Commonwealth v. Sepulveda*, [] 144 A.3d 1270, 1280 n.19 ([Pa.] 2016). In *Levy v. Senate of Pennsylvania*, 94 A.3d 436 (Pa. Cmwlth.), *appeal denied*, [] 106 A.3d 727 (Pa. 2014), which the Supreme Court cited with approval in *Sepulveda*, this Court explained: "Where a case is remanded for a specific and limited purpose, 'issues not encompassed within the remand order'

**(Footnote continued on next page…)**

2

examined the constitutionality of legislative enactments to The Fiscal Code[5] relating to funds generated from the leasing of State forest and park lands for oil and gas exploration and extraction. The Supreme Court began its analysis by closely examining the contours of the Environmental Rights Amendment, which provides:

> The people have a right to clean air, pure water, and to the preservation of the natural, scenic, historic and esthetic values of the environment. Pennsylvania's public natural resources are the common property of all the people, including generations yet to come. As trustee of these resources, the Commonwealth shall conserve and maintain them for the benefit of all the people.

Pa. Const. art. I, §27. The Supreme Court determined that Section 27 "establishes a public trust, pursuant to which the natural resources are the corpus of the trust, the Commonwealth is the trustee, and the people are the named beneficiaries." *PEDF II*, 161 A.3d at 931-32.

The Supreme Court continued that the "public natural resources" referenced in Section 27 "include the [S]tate forest and park lands leased for oil and gas exploration and . . . the oil and gas themselves." *PEDF II*, 161 A.3d at

---

**(continued…)**

> may not be decided on remand. A remand does not permit a litigant a 'proverbial second bite at the apple.'" *Levy*, 94 A.3d at 442 (quoting *In re Indep. Sch. Dist. Consisting of the Borough of Wheatland*, 912 A.2d 903, 908 (Pa. Cmwlth. 2006)).

*Marshall v. Commonwealth*, 197 A.3d 294, 306 (Pa. Cmwlth. 2018).

[5] Act of April 9, 1929, P.L. 343, *as amended*, 72 P.S. §§1-1805.

931. "[S]tate parks and forests, including the oil and gas minerals therein, are part of the corpus of Pennsylvania's environmental public trust." *Id.* at 916.

The Commonwealth is the trustee and not the proprietor of public natural resources. *PEDF II*, 161 A.3d at 932. As trustee of the public natural resources, the Commonwealth has the duty to act toward the corpus of the trust with loyalty, impartiality and prudence. *Id.* at 932 (citing *Robinson Township v. Commonwealth*, 83 A.3d 901, 956-57 (Pa. 2013) (plurality)). This includes the "duty to prohibit the degradation, diminution, and depletion of our public natural resources." *Id.* at 933. In addition, the Commonwealth "must act affirmatively via legislative actions to protect the environment." *Id.* at 933 (citing *Robinson Township*, 83 A.3d at 957-58).

The Supreme Court also reviewed the history of the laws relative to oil and gas funds and the recent legislative transfers. Briefly, in 1955, the General Assembly enacted the Oil and Gas Lease Fund Act ("Lease Fund Act"),[6] which has

---

[6] Act of December 15, 1955, P.L. 865, *formerly* 71 P.S. §§1331-1333, repealed by the Act of October 30, 2017, P.L. 725. The Lease Fund Act was replaced by Section 1601.2-E of The Fiscal Code, added by the Act of October 30, 2017, P.L. 725, 72 P.S. §1601.2-E. Section 1601.2-E continues to provide that "[r]ents and royalties from oil and gas leases of land owned by the Commonwealth, except rents and royalties received from game and fish lands" shall be deposited into a special fund." 72 P.S. §1601.2-E. The fund also includes: payments provided for in Section 5 of the Act of October 8, 2012, P.L. 1194, 71 P.S. §1357.5, known as the "Indigenous Mineral Resources Development Act," and "[a]ny other money appropriated or transferred to the fund." *Id.* Rents and royalties continue to remain undefined. *See* Section 1601-E of The Fiscal Code, added by the Act of October 9, 2009, P.L. 537, 72 P.S. §1601-E (definitions).

As for the permitted "use" of money within the Lease Fund, Section 1601.2-E of The Fiscal Code now provides: "Money in the fund may only be used as provided under subsection (e) or as annually appropriated by the General Assembly. In making an appropriation from the fund, the General Assembly shall consider the Commonwealth's trustee duties under section 27 of Article I of the Constitution of Pennsylvania." 72 P.S. §1601.2-E. Subsection (e) permitted the following annual transfers:

**(Footnote continued on next page…)**

since been repealed,[7] requiring "[a]ll rents and royalties from oil and gas leases" of Commonwealth land to be deposited in the "Oil and Gas Lease Fund" ("Lease Fund") to be "exclusively used for conservation, recreation, dams, or flood control or to match any Federal grants which may be made for any of the aforementioned purposes." *Former* Section 1 of the Lease Fund Act, *formerly* 71 P.S. §1331. Neither rents nor royalties were defined therein. The Lease Fund Act specifically appropriated all money in the Lease Fund to the Department of Forests and Waters to carry out the purposes of the act and provided the Secretary of Forests and Waters with the discretion to determine the need and the location for projects. *PEDF II*, 161 A.3d at 919-20; *former* Sections 2 and 3 of the Lease Fund Act, *formerly* 71 P.S. §§1332, 1333.

With the enactment of the Conservation and Natural Resources Act ("CNRA"),[8] the Department of Conservation and Natural Resources ("DCNR"), replaced the Department of Forests and Waters as the relevant entity for purposes

---

**(continued…)**

> (1) For the 2017-2018 fiscal year and each fiscal year thereafter, $20,000,000 shall be transferred from the fund to the Marcellus Legacy Fund for distribution to the Environmental Stewardship Fund.
>
> (2) For the 2017-2018 fiscal year and each fiscal year thereafter, $15,000,000 shall be transferred from the fund to the Marcellus Legacy Fund for distribution to the Hazardous Sites Cleanup Fund.

72 P.S. §1601.2-E(e).

[7] The Lease Fund Act was repealed after the Supreme Court's opinion in *PEDF II*, which was decided on June 20, 2017.

[8] Act of June 28, 1995, P.L. 89, *as amended*, 71 P.S. §§1340.101 - 1340-1103.

5

of the Lease Fund.  Section 101 of the CNRA(b)(1), 71 P.S. §1340.101(b)(1); Section 301 of the CNRA, 71 P.S. §1340.301; Section 304 of the CNRA 71 P.S. §1340.304; *see former* 71 P.S. §1333.  The CNRA altered the Lease Fund Act "to provide that 'all moneys' paid in to the Lease Fund were 'specifically appropriated to' the DCNR."  *PEDF II*, 161 A.3d at 920 (quoting *former* 71 P.S. §1333).  The CNRA empowered DCNR "to make and execute contracts or leases in the name of the Commonwealth for the mining or removal of any valuable minerals that may be found in State forests" if the DCNR determines that it "would be for the best interests of this Commonwealth."  71 P.S. §1340.302(a)(6).

Pursuant to this authority, DCNR entered into oil and gas leases for natural gas extraction.  Of significance here, in 2008, DCNR began lease sales of State forest land in the Marcellus Shale region of northcentral Pennsylvania.  "The Marcellus Shale leases dramatically increased the money flowing into the Lease Fund."  *PEDF II*, 161 A.3d at 920.

The oil and gas leases generated funds in the form of royalties, rents and bonuses.  *PEDF II*, 161 A.3d at 920.  Per the lease terms, royalties are paid when gas is extracted, with the payment based upon the amount of marketable gas extracted. *Id.* at 921.  The rents are comprised of annual rental fees, an example of which ranged from $20-35 per acre, in addition to large initial "bonus payments" ranging in the millions of dollars.  *Id.*

In determining whether those payments constituted part of the trust corpus, the Supreme Court opined that, "pursuant to Pennsylvania law in effect at the time of enactment, proceeds from the sale of trust assets are part of the corpus of the trust."  *PEDF II*, 161 A.3d at 933 (citing *In re McKeown's Estate*, 106 A. 189, 190 (Pa. 1919) ("Being a sale of assets in the corpus of the trust,

6

presumptively all the proceeds are principal. . . .")). "Pennsylvania trust law dictates that *proceeds from the sale of trust assets* are trust principal and remain part of the corpus of the trust." *PEDF II*, 161 A.3d at 935 (citing *McKeown's Estate*, 106 A. at 190) (emphasis added). "When a *trust asset is removed from the trust*, all revenue received in exchange for the trust asset is returned to the trust as part of its corpus." *PEDF II*, 161 A.3d at 935 (citing *Bolton v. Stillwagon*, 190 A.2d 105, 109 (Pa. 1963)) (emphasis added).

Ultimately, the Supreme Court determined that "all proceeds from the sale of our public natural resources are part of the corpus of our environmental public trust and that the Commonwealth must manage the entire corpus according to its fiduciary obligations as trustee." *PEDF II*, 161 A.3d at 939. The Supreme Court held that "royalties - monthly payments based on the gross production of oil and gas at each well - are unequivocally proceeds from the sale of oil and gas resources." *Id.* at 935. As such, funds generated from royalties are part of the corpus and must be committed to furthering the purposes, rights and protections afforded under Section 27, i.e., to conserve and maintain our natural resources. *Id.* at 935. "They are part of the corpus of the trust and the Commonwealth must manage them pursuant to its duties as trustee." *Id.* Consequently, the Supreme Court ruled that legislative enactments relating to the use of royalties in the Lease Fund were facially unconstitutional because they diverted proceeds from the sale of oil and gas, i.e., royalties, to non-trust purposes in violation of Section 27.[9] *Id.* at 938-39.

---

[9] Specifically, the Supreme Court declared that Sections 1602-E and 1603-E of The Fiscal Code, added by the Act of October 9, 2009, P.L. 537, 72 P.S. §§1602-E, 1603-E, are facially unconstitutional. Section 1602-E provided:

**(Footnote continued on next page…)**

7

However, the Supreme Court was less clear on how to categorize other revenue streams from State forest oil and gas leases, i.e., rents and bonuses, stating that "the record on appeal is undeveloped regarding the purpose of up-front bonus payments, and thus no factual basis exists on which to determine how to categorize this revenue." *PEDF II*, 161 A.3d at 935. The Supreme Court recognized that the leases designate bonuses and other annual payments as "rental payments," but stated that "such a classification does not shed any light on the true purpose of the payment, e.g., rental of a leasehold interest in the land, payment for the natural gas extracted, or some other purpose." *Id.* Thus, the Supreme Court remanded the matter to this Court for further proceedings. *Id.*

In this remand, the question before us is whether the proceeds generated from rents and bonuses under the oil and gas leases must be devoted to the conservation and maintenance of our public natural resources, or may be used

---

**(continued…)**

> Notwithstanding any other provision of law and except as provided in section 1603-E, no money in the fund *from royalties* may be expended unless appropriated or transferred to the General Fund by the General Assembly from the fund. In making appropriations, the General Assembly shall consider the adoption of an allocation to municipalities impacted by a Marcellus well.

72 P.S. §1602-E (emphasis added). Section 1603-E provided:

> Subject to the availability of money in the [Lease Fund] following transfers, up to $50,000,000 from the [Lease Fund] *from royalties* shall be appropriated annually to [DCNR] to carry out the purposes set forth in the [Lease Fund Act]. [DCNR] shall give preference to the operation and maintenance of State parks and forests.

72 P.S. §1603-E (emphasis added).

for other purposes without violating the Environmental Rights Amendment. More particularly, we are tasked with determining the constitutionality of Sections 1604-E and 1605-E of The Fiscal Code,[10] and Section 1912 of the Supplemental General Appropriations Act of 2009,[11] which directed that certain money deposited into the Lease Fund be transferred to the General Fund to pay for government operations in 2009 and 2010. None of these enactments indicate on their face whether the funds transferred related to royalties, rents, or bonus bid payments, or some combination of the three. *See PEDF II*, 161 A.3d at 923 n.11.

As the Supreme Court instructed, the constitutionality of these acts "depends on whether they result from the Commonwealth's faithful exercise of its fiduciary duties vis a vis our public natural resources and any proceeds derived

---

[10] Section 1604-E was added by the Act of October 9, 2009, P.L. 537, 72 P.S. §1604-E, and provides: "Notwithstanding section 1603-E or any other provision of law, in fiscal year 2009-2010 the amount of $60,000,000 shall be transferred from the [Lease Fund] to the General Fund." 72 P.S. §1604-E.

Section 1605-E was added by the Act of July 6, 2010, P.L. 279, 72 P.S. §1605-E, and provides:

> (a) Fiscal year 2010-2011.--Notwithstanding section 1603-E or any other provision of law, in fiscal year 2010-2011, the amount of $180,000,000 shall be transferred from the [Lease Fund] to the General Fund.

> (b) Fiscal year 2014-2015.--Notwithstanding section 1603-E or any other provision of law, in fiscal year 2014-2015, the amount of $95,000,000 shall be transferred from the [Lease Fund] to the General Fund.

72 P.S. §1605-E.

[11] Act of October 9, 2009, P.L. 779. Section 1912 of the Supplemental General Appropriations Act of 2009 directed the transfer of $143 million from the Lease Fund to the General Fund.

from the sale thereof." *PEDF II*, 161 A.3d at 939. The Supreme Court opined that "the legislature's diversion of funds from the Lease Fund (and from the DCNR's exclusive control) does not, in and of itself, constitute a violation of Section 27." *Id.* Rather, "the legislature violates Section 27 when it diverts proceeds from oil and gas development to a non-trust purpose without exercising its fiduciary duties as trustee." *Id.*

> The Supreme Court directed:
>
> In construing Sections 1604–E and 1605–E, to the extent that the lease agreements reflect the generation of revenue streams for amounts other than for the purchase of the oil and gas extracted, it is up to the Commonwealth Court, in the first instance and *in strict accordance and fidelity to Pennsylvania trust principles*, to determine whether these funds belong in the corpus of the Section 27 trust.

*PEDF II,* 161 A.3d at 935-36 (emphasis added). More particularly, we must adhere to *private trust principles*. *Id.* at 933 n.26.

The Supreme Court elaborated that, although Section 27 creates a public trust, the "'public trust doctrine' does not set forth universally applicable black letter law and that Pennsylvania has no established public trust principles applicable to Section 27." *Id.* "At most, the public trust doctrine provides a framework for states to draft their own public trust provisions, which (like many trust instruments) will ultimately be interpreted by the state courts." *Id.* The Supreme Court instructed that Pennsylvania's "private trust principles provide . . . the necessary tools to properly interpret the trust created by Section 27." *Id.*

> Further, the Supreme Court directed:
>
> On remand, the parties should be given the opportunity to develop arguments concerning the proper classification,

10

pursuant to trust law, of any payments called 'rental payments' under the lease terms. *To the extent such payments are consideration for the oil and gas that is extracted, they are proceeds from the sale of trust principal and remain in the corpus. These proceeds remain in the trust and must be devoted to the conservation and maintenance of our public natural resources, consistent with the plain language of Section 27.*

*Id.* at 936 (emphasis added).

Finally, the Supreme Court emphasized that "the proper standard of judicial review *lies in the text of Article I, Section 27 itself as well as the underlying principles of Pennsylvania trust law in effect at the time of its enactment.*" *PEDF II*, 161 A.3d at 930 (emphasis added). In accordance with these remand instructions, we review the matter before us.

## II. ISSUE

On remand, the parties developed the record and now present their cross-applications for summary relief.[12] The crux of the matter is whether bonuses

---

[12] Rule 1532(b) of the Pennsylvania Rules of Appellate Procedure, governing summary relief, provides that "[a]t any time after the filing of a petition for review in an original jurisdiction matter the court may on application enter judgment if the right of the applicant thereto is clear." Pa. R.A.P. 1532(b). We may grant summary relief "only if no material questions of fact exist and the right to relief is clear." *PEDF II*, 161 A.3d at 929. In addition:

> [A]s challenges to the constitutionality of statutes present pure questions of law, our standard of review is *de novo*, and our scope of review is plenary. As with any constitutional challenge to legislation, the challenger bears the heavy burden of demonstrating that the statute "clearly, plainly, and palpably violates the Constitution," as we presume that our sister branches act in conformity with the Constitution. In interpreting constitutional language, the fundamental rule of construction which guides [this Court] is that the Constitution's language controls and must be

**(Footnote continued on next page…)**

11

and rental payments set forth in the Commonwealth's oil and gas leases are compensation for the sale of natural resources and, thus, part of the corpus trust that must be used to conserve and maintain those natural resources, or income that may be used for General Fund purposes under the Environmental Rights Amendment.[13]

### III. DISCUSSION
### A. Contentions
### 1. The Foundation's Position

The Foundation contends that bonus and rental payments from the Commonwealth's oil and gas leases are part of the corpus of the Section 27

---

**(continued…)**

> interpreted in its popular sense, as understood by the people when they voted on its adoption. As with our interpretation of statutes, if the language of a constitutional provision is unclear, we may be informed by "the occasion and necessity for the provision; the circumstances under which the amendment was ratified; the mischief to be remedied; the object to be attained; and the contemporaneous legislative history.

*Id.* (internal citations and quotations omitted).

[13] We note that the issue is not necessarily restricted to money in the Lease Fund or DCNR's ability to use that money. As our Supreme Court noted:

> DCNR is not the only agency committed to conserving and maintaining our public natural resources, and the General Assembly would not run afoul of the constitution by appropriating trust funds to some other initiative or agency dedicated to effectuating Section 27. *By the same token, the Lease Fund is not a constitutional trust fund and need not be the exclusive repository for proceeds from oil and gas development.*

*PEDF II*, 161 A.3d at 939 (emphasis added).

environmental trust. The leases make no distinction between bonuses and rental payments and royalty payments. These payments are all consideration for the purchase of oil and gas. Under trust principles in effect when Section 27 was adopted, when a lease authorized the complete removal of oil and gas from the leased premises, *all* of the proceeds were considered payments for the sale of oil and gas and remained part of the corpus or principal. *See* Petitioner's Amended Application for Relief at 12-13 (citing *In re Bruner's Will*, 70 A.2d 222 (Pa. 1950) and *Blakley v. Marshall*, 334 A. 564 (Pa. 1896)). The trust established by Section 27 does not authorize the trustee to allocate proceeds from the sale of Pennsylvania's public natural resources for purposes other than the conservation and maintenance of those resources. Thus, the Commonwealth's fiscal enactments authorizing the transfer of corpus funds for non-trust purposes are facially unconstitutional under Section 27.

### 2. Commonwealth's Position

The Commonwealth contends that up-front bonus bid payments and rental payments do not constitute compensation for sale of the trust principal. The bonus payment is money paid by the highest bidder to obtain the lease in a formal bid process. Rental payments are due on an annual basis and secure the lessee's right to explore for oil and gas. Neither payment is consideration for the severance of natural resources from the land. Rather, under common law, they are consideration for an inchoate title for the right to explore for oil and gas. This is supported by the fact that DCNR retains any bonus bid payments and rentals received even when no oil or gas is produced. If the exploration for oil and gas is

13

unsuccessful, no estate vests in the lessee and the lease terminates at the end of the lease's primary term.

Royalty payments, on the other hand, are directly related to the extraction of oil and gas, and only become due and owing if oil or gas is extracted. Royalty payments represent proceeds from the extracted oil and gas and are consideration to DCNR for those public natural resources.

Under current statutory law, rent is to be allocated as trust income, not as trust principal. *See* Section 8145(a) of the Pennsylvania Uniform Principal and Income Act (2002 Act), 20 Pa. C.S. §8145(a). Only refundable deposits for rent shall be applied to principal. *See* Section 8145(b)(1) of the 2002 Act, 20 Pa. C.S. §8145(b)(1). Neither bonuses nor rent payments are refundable at the termination of DCNR's leases. Thus, they are income, not trust principal.

Thus, the Commonwealth avers that, because bonus-bid and rent payments are not compensation for the sale of trust assets, they are not corpus of the trust and the appropriation of those funds does not violate Article I, Section 27 of the Pennsylvania Constitution.

### B. Fundamentals of Oil and Gas Leases

We begin our discussion with an examination of oil and gas leases and the interests conveyed therein. America's foray into oil and gas extraction began in Pennsylvania in the early 1850s. The first oil well in the United States was established on Oil Creek (present-day Oil Creek State Park), Cherrytree Township, Venango County, Pennsylvania, and the first gas well was bored in Erie, Pennsylvania. Eugene Kuntz, *A Treatise on the Law of Oil and Gas* §1.6 (1987). The basic instrument of the petroleum industry is the oil and gas lease. Robert E. Sullivan, *Handbook of Oil and Gas Law* 69 (1955). The first oil lease entered in

14

America occurred in 1853 in Pennsylvania. Kuntz §1.32. "[T]he Commonwealth has a history of leasing its land to private parties for oil and gas exploration dating back to 1947." *PEDF II*, 161 A.3d at 919.

## 1. A Lease is a Contract

Since then, the area of law dealing with oil and gas leases has burgeoned. "[T]here have been many and radical developments in the industry with corresponding changes in the contracts employed to define the respective rights of land owners and operators and the laws and decisions have kept pace with these advances." *Appeal of Baird*, 6 A.2d 306, 310 (Pa. 1939). As our Supreme Court has recognized, the traditional oil and gas 'lease' is unique and "far from the simplest of property concepts." *Brown v. Haight*, 255 A.2d 508, 510 (Pa. 1969). At its core, "a lease is in the nature of a contract and is controlled by principles of contract law." *T.W. Phillips Gas & Oil Co. v. Jedlicka*, 42 A.3d 261, 267 (Pa. 2012). Accordingly, it must be construed "in accordance with the terms of the agreement as manifestly expressed, and '[t]he accepted and plain meaning of the language used, rather than the silent intentions of the contracting parties, determines the construction to be given the agreement.'" *Id.* (citation omitted).

## 2. Interests Conveyed

Typically, the landowner, as the oil and gas lessor, has three distinct interests in the land and the minerals contained therein: (1) a possessory interest in the surface except insofar as it may interfere with drilling operations; (2) a right to receive bonus, rentals and royalties under the lease; and (3) the possibility of reverter in the minerals in place. Sullivan at 69.

The tenant, or oil and gas lessee, acquires a possessory interest in the minerals. *Id.* The tenant is able to use only so much of the surface as may be necessary for drilling operations. *Id.* His possession of the mineral estate is contingent upon discovery and production. *Id.* Many cases have considered the interests of lessees under oil and gas leases in various contexts. *Baird's Appeal*, 6 A.2d at 310. It is helpful in this context in determining the nature of the payments exchanged for that interest.

"In the case law[,] oil and gas 'leases' have been described as anything from licenses to grants in fee." *Brown*, 255 A.2d at 510. Initially, Pennsylvania classified the lessee's interest as an incorporeal hereditament, not a conveyance of title. *Funk v. Haldeman*, 53 Pa. 229, 241 (1866) (a grant of the right to search for or "experiment for oil" and take all the minerals in the land of another, yielding a royalty to the grantor, is an incorporeal hereditament). Later cases consistently held that the title conveyed in an oil and gas lease is inchoate, and is initially for the purpose of exploration and development. *Burgan v. South Penn Oil Co.*, 89 A. 823, 826 (Pa. 1914); *Calhoon v. Neely*, 50 A. 967, 968 (Pa. 1902); *Venture Oil Co. v. Fretts*, 25 A. 732 (Pa. 1893); *see also Sabella v. Appalachian Development Corp.*, 103 A.3d 83, 101 (Pa. Super. 2014); *Hite v. Falcon Partners*, 13 A.3d 942, 945 (Pa. Super. 2011); *Jacobs v. CNG Transmission Corp.*, 332 F. Supp. 2d 759, 772 (W.D. Pa. 2004).

Regardless of how the interests are classified, the general purpose of an oil and gas lease is to secure the right to explore and develop the property with the expectation of receiving large returns from the royalties payable on production. Sullivan at 72. Once oil or gas is discovered, captured, and removed, it becomes the property of the lessee. *Brown*, 255 A.2d at 512; *Venture Oil Co. v. Fretts*,

16

25 A. at 735. The lessee obtains a fee simple determinable estate. *Brown*, 255 A.2d at 512; *Venture Oil*, 25 A. at 735. The lessee's right to extract oil or gas becomes vested. *Venture Oil*, 25 A. at 735. If no oil or gas is produced, no estate vests. *Id.*

### 3. Consideration

In order for the contract to be valid, there must be consideration conveyed. *Shedden v. Anadarko E. & P. Co., L.P.*, 136 A.3d 485, 490 (Pa. 2016) (citing *T.W. Phillips Gas*, 42 A.3d at 267). The same holds true with oil and gas leases. *Id.* There are various forms of consideration paid by a lessee for the privilege of exploring for and producing oil and gas such as royalties, rentals, bonuses, and interest. Our focus on remand is on rentals and bonuses.

### a. Rentals

"The term 'rental' as used in standard oil and gas leases, refers to the consideration paid to the lessor for the privilege of delaying drilling operations." Sullivan at 126 n.9. Sometimes, this is referred to as a "delayed rental." The term "rent" has also been used to describe a flat sum to be paid for each producing well. George G. Bogert, *The Law of Trusts and Trustees* §827 (rev. 2019). Typically, rents do not depend on the discovery or production of oil and gas, but rather represent compensation for the time to explore. Sullivan at 125 n.4.

Standard oil and gas leases provide for rents for a set number of years until oil and gas is discovered. Sullivan at 104. This affords the lessee time to explore and develop the property. *Id.* at 104. If oil or gas is not found within that set time, the lease automatically terminates. *Id.* Therefore, it is incumbent for the

tenant to secure the testing, development and operation of the leased premises for oil and gas purposes during the set term. *Id.* The purpose of the rent is to compensate the landowner for this exploration time because he is not receiving royalties. *Id.* Typically, once oil or gas is discovered in paying quantities, payments from rentals convert to royalties.

### b. Bonuses

As oil and gas leases became more lucrative, it became common practice to pay a bonus, i.e., "a substantial sum initially as an inducement to the landowner to grant the lease." Sullivan at 108. The amount varies depending upon the prospective value of the land for oil and gas purposes. *Id.*

"The word 'bonus' has a definite meaning in the oil and gas industry. It is defined . . . as a premium paid to a grantor or vendor, and strictly in the cash consideration or down payment paid or agreed to be paid for the execution of an oil and gas lease." Sullivan at 126 n.9. A bonus is a sum paid for the execution of the lease, representing its market value, or to be paid later out of the lessee's share of the production of a well. Bogert §827.

In Pennsylvania, bonus provisions in mineral leases have served different purposes. In some cases, the bonuses were due and owing based upon actual production. *See Burgan* (the lease required lessee to pay a bonus if the first well drilled produced 50 barrels of oil per day for 60 days); *Akin v. Marshall Oil Co.*, 41 A. 748 (Pa.), *aff'd sub nom. Stone v. Washington Oil Co.*, 41 A. 1119 (Pa. 1898) (bonus payable if gas discovered and produced in paying quantities); *Nelson v. Eachel*, 27 A. 1103 (Pa. 1893) (a bonus in the form of a judgment note was payable only upon production); *Brushwood Developing Co. v. Hickey*, 16 A. 70

18

(Pa. 1888) (bonuses were based on the amount of oil extracted); *see also Wilson v. Philadelphia Co.*, 60 A. 149, 150 (Pa. 1904) (bonus due upon the completion of the first well).

In other cases, the bonuses were given for the right to explore or enter the lease, but were not based on the actual production of oil and gas. *See Brandon v. McKinney*, 82 A. 764 (Pa. 1912) (a bonus was paid for the lease); *Glasgow v. Chartiers Oil Co.*, 25 A. 232 (Pa. 1892) (bonus paid for the right to explore and develop the land); *see also Carnegie National Gas Co. v. Philadelphia Co.*, 27 A. 951 (Pa. 1893) (the lessee forfeited an existing lease and entered a new lease by paying a bonus).

In some cases, the bonus payment was split for a dual purpose. *See McMillin v. Titus*, 72 A. 240, 243 (Pa. 1909) (one bonus was given as consideration for the initial right to occupy the premises and explore for oil; the other bonus was payable only if oil or gas was found in paying quantities); *Smiley v. Gallagher*, 30 A. 713 (Pa. 1894) (part of the bonus was to be paid when the lease was delivered, part of the bonus was to be paid out of the first oil produced).

Bonuses have also been used as part of a competitive bidding process in securing oil and gas leases. *See Parry v. Miller*, 93 A. 30, 32 (Pa. 1915); *Lenau v. Co-eXprise, Inc.*, 102 A.3d 423, 425 (Pa. Super. 2014).

### 4. Duty to Explore and Drill

In addition to paying consideration, early cases imposed a duty upon the lessee to explore during the lease term or risk loss by abandonment. *See Baird's Appeal*, 6 A.2d at 311; *Venture Oil*, 25 A. at 735. Later cases backed away from this premise, particularly where the lease provided for rentals and bonuses as

compensation for a set term. *See Hite*, 13 A.3d at 946 (delay rental payment relieved the company of any obligation to develop the leasehold during the primary term, but not beyond). Such payments ensured that the lessor would be compensated for the lessee's delay or default in exploring and developing the property. *Ray v. Western Pennsylvania Natural Gas Co.*, 20 A. 1065, 1066 (Pa. 1891) (the payments "were intended not only to spur the operator, but to compensate [the lessor] for the operator's delay or default").

Next, we examine whether rents and bonuses in the Commonwealth's oil and gas leases constitute income or principal pursuant to Pennsylvania trust principles in effect at the time of Section 27's enactment. *PEDF II*, 161 A.3d at 930.

### C. Pennsylvania Trust Law

Under trust law, the question of the relative rights between present and future interests, particularly with regard to rents or bonuses under oil and gas leases, is a complex one.[14] As our Supreme Court instructed, we must adhere to

---

[14] *See Rights of tenant for life or for years and remaindermen inter se in royalties or rents under oil, gas, coal, or other mineral lease*, 18 A.L.R.2d 98, §2 (1951). In the absence of a special trust provision or statute, the allocation among beneficiaries of proceeds from oil and gas leases follows the division of proceeds between the owner of a legal life estate and the owner of the complementary future interest depending upon application of the "open mine" or "open well" doctrine, discussed *supra*. 18 A.L.R.2d 98, §2; Kuntz §8.7. There is a split of authority as to whether a bonus paid for an oil and gas lease is income or principal to be conserved for the remainder beneficiary. 18 A.L.R.2d 98, §2; Kuntz §8.7; *see* Bogert §827 (a bonus is a sum paid for the execution of the lease, representing its market value, or to be paid later out of the lessee's share of the production of a well); Sullivan at 108 (the principal questions are whether the cash bonus is merely additional consideration for the execution of the lease or additional or advance royalties). According to one view, the bonus is not payment for depletion of oil and gas, but rather income from the premises and the life tenant may retain the entire sum. Kuntz §8.7; Sullivan at 75. The other view is that the bonus is paid for the right to deplete the corpus and represents a part of the consideration for the sale of the mineral estate. Kuntz §8.7; Walter L.

**(Footnote continued on next page…)**

20

Pennsylvania trust law principles at the time of Section 27's enactment. To understand trust law as it stood in 1971, we begin by examining fundamental trust elements and common law doctrines relating to mineral leases.

### 1. Common Law
### a. Basic Trust Elements

The basic elements of a trust include the trust instrument, which is the document, which expresses the testator's intent and sets forth the trust terms. Bogert §1. The trust property or corpus is the interest in property, real or personal, tangible or intangible, which the trustee holds, subject to the rights of another. *Id.* The settlor of a trust is the person who intentionally causes it to come into existence. Bogert §2. The beneficiary or *cestui que trust* is the person for whose benefit the trustee holds the trust property. *Id.* The beneficiary of a public or charitable trust is the public. Bogert §27. At common law, where the testator creates a life estate, a life tenant is entitled to income derived from the corpus, but not to assets representing the corpus itself, which is reserved for the beneficiaries in remainder or "remaindermen." Bogert §27.

As the Supreme Court in *PEDF II* established, the trust instrument here is Section 27; the trust property is Pennsylvania's public natural resources; the Commonwealth is the trustee; and the people of Pennsylvania – both current and

---

**(continued…)**

Summers, *A Treatise on the Law of Oil and Gas* §586 (1958). Under the latter view, a life tenant is only entitled to the interest thereon. Sullivan at 74. However, "a problem arises as to whom they are payable inasmuch as these provisions are covenants that run with the land and with the lease." Sullivan at 108. Rentals have also been variously apportioned as income or principal depending upon the application of the doctrine.

future generations – are the beneficiaries. 161 A.3d at 932-33. Pennsylvanians have both a present and future interest in the trust. In essence, today's generation represents life tenants or life beneficiaries of the trust and tomorrow's generation represents the remainder interest. It is necessary to make this analogy because the origin of the law concerning present and future interest rights in minerals lies in the common law doctrines of "waste" and "open wells." 18 A.L.R.2d 98, §2.

### b. Waste and the Open Well Doctrine

"Waste" refers to "the spoil or destruction of the estate." *Irwin v. Covode*, 24 Pa. 162, 164 (1854). Natural resources, which can be extracted and depleted, are considered "wasting assets." Bogert §827; Robert A. Wyler, Jr., *The Apportionment of Proceeds from Depletable Natural Resources Held in Trust*, 18 Hastings L.J. 391, 397-98 (1966); Restatement (Second) of Trusts §239 (Am. Law Inst. 1959). It was regarded as "waste" for a life tenant to open a new mine or well and take minerals therefrom, unless the right to do so was expressly or by implication granted by the settlor. *Appeal of Eley*, 103 Pa. 300, 307 (1883); *Marshall v. Mellon*, 36 A. 201, 201 (Pa. 1879); *Westmoreland Coal Co.'s Appeal*, 85 Pa. 344, 346 (1877). "The reason why tenants for life, as a general rule, cannot open and operate new mines, is because it would be a lasting injury to the inheritance . . . ." *Eley's Appeal*, 103 Pa. at 307. In other words, it would permanently injure the reversionary interest in the estate.

Conversely, under what is commonly referred to as the "open mine" or "open well" doctrine, it was not considered "waste" for a life tenant to continue working a mine or well that was opened by the former owner. *Irwin*, 24 Pa. at 165; *accord Neel v. Neel*, 19 Pa. 323, 327 (1852) ("as to all tenants for life, the rule has

22

always been that the working of open mines of all sorts is not waste"). Indeed, a life tenant was permitted "to operate previously opened mines, and work the same even to exhaustion." *Eley's Appeal*, 103 Pa. at 307. "The tenant for life has the usufruct of the whole land, and takes the whole profit that can be derived from it in following out the use made of it by the donor." *Neel*, 19 Pa. at 327-328.

The open well doctrine addressed trusts that made no provision for a trustee to sell or convert the lands. 18 A.L.R.2d 98, §2. The reasoning behind the doctrine was that if a life tenant opened new wells or new mines, he would be "wasting" or injuring the estate, whereas if he simply continued to use the wells or mines already opened by the testator, he is merely enjoying the use of the estate in the same manner in which it was enjoyed when the estate came into being. *Bruner's Will*, 70 A.2d at 224.

Under the doctrine, a life tenant was entitled to all the proceeds, including royalties, from an oil well drilled or a coal mine opened during the testator's lifetime. *Bruner's Will*, 70 A.2d at 224 (citing *McFadden's Estate*, 73 A. 927 (Pa. 1909)). If a well or mine was not opened, but trustees were nevertheless empowered by the trust instrument to lease the minerals, the same principle of law applied. *Id.* However, if no wells were drilled or mines opened and no power was given to lease, all proceeds from the lease were considered as principal, not income. *Id.* In short, if the mine was open, all proceeds were treated as income; if unopened, they were treated as principal. Austin Wakeman Scott, *The Law of Trusts* §239.3 (3d ed. 1967); Kuntz §8.2.

For years, the open well doctrine served as an "aid in the construction and interpretation of documents pertaining to mineral rights." *Doverspike v. Chambers*, 516 A.2d 392, 395 (Pa. 1986). For example, in *Eley's Appeal*, the

23

Supreme Court applied the open well doctrine to a trust that gave the executors the power "to lease the coal" with the consent of six-tenths of the owners. 103 Pa. at 300. The Court determined that this gave the life tenants the same rights over unopened mines that they would have had if the mines had been opened and operated in testator's lifetime. *Id.* at 305. The Supreme Court considered whether distributions accrued from the coal lease, which included royalties and rents, should be treated as principal or income. *Id.* It opined:

> The word income means the gain which accrues from property, labor or business. In its ordinary and popular meaning, it is strictly applicable to the periodical payments, in the nature of rent, which are usually made under coal and other mineral leases, and we have no doubt it was used in that sense by the testator. In the absence of any provision, express or implied, that the payments in the nature of rent shall be accumulated for the ultimate benefit of those in remainder, it would be a strained and unnatural construction of the will to hold that he intended to give appellants only the annual interest on the installments of rent.

*Id.* at 306. Thus, the *Eley* Court determined the "produce of the mines . . . whether in royalties, *or in whatever other way it is produced*," including rents, formed the profit of the estate and was payable *to the life tenant as income and did not form corpus*. *Id.* at 307 (emphasis added).

Shortly thereafter, in *Appeal of Wentz*, 106 Pa. 301 (1884), the Supreme Court reaffirmed that where the governing instrument granted the trustee the power to lease the estate, it was the equivalent to an open mine. There, a testator directed by his will that his executor should "collect and pay all the income" arising from his estate both real and personal to his wife, with the remainder to his children and their children. 106 Pa. at 301. Significantly, the will authorized the executors to sell or lease the estate, which was chiefly valuable for

24

coal mining purposes but had never been mined or developed during testator's lifetime. 106 Pa. at 301. Although the mines were not open during the testator's life, the Court held that the wife, i.e., the life tenant, was entitled to the income arising from the estate, which included rents and royalties arising under the mining leases. *Id*. at 307. The Court explained that, because the executors had the power to sell or lease testator's real estate, this power included the ability to lease the coal in a mine on the estate, even if unopened. In other words, the "power to lease, as well as sell" a testator's estate was equivalent to an open mine during the testator's life. *Id.* at 307.

In *Blakley*, the Supreme Court again applied the doctrine. There, the settlors established a trust conveying a life estate in the land with the remainder in fee for their children and appointed themselves as life tenants and trustees for those in remainder. There were no wells opened on the estate and the trust instrument did not authorize the trustees to enter mineral leases. The life tenants and trustees executed a lease "for the purpose of operating and drilling for petroleum and gas," for the term of 15 years, and "so long thereafter as oil and gas can be produced in paying quantities." The lease invested the lessee "with the right to remove all the oil in place in consideration of his giving the lessors a certain percentum thereof." 34 A. at 565.

The *Blakley* Court held that any proceeds, including rent and royalties, constituted corpus, not income. 34 A. at 565. The Court opined that "oil in place is a mineral, and, being a mineral, it is part of the realty," such that any proceeds from the sale must go towards the corpus. *Id.* (citing *Appeal of Stoughton*, 88 Pa. 201 (1878)). The life tenants were only "entitled to the enjoyment of the fund (i.e.,

interest thereon) during life, and at the death of the survivor the corpus of the fund should go to the remaindermen." *Id.*

As with royalties and rents, the open well doctrine has also played a role in how bonus money was treated. *See Bruner's Will.* In *Bruner's Will*, the Supreme Court applied the open well doctrine to bonus payments and royalties devised in an oil and gas lease. 70 A.2d at 224. It is one of the only cases to characterize bonuses under oil and gas leases for trust purposes. There, the testator bequeathed his estate to the trustees, in trust, with the direction to pay the net income to the life beneficiaries with the final distribution to go to the remaindermen. *Id.* at 223. The trust authorized trustees "to sell and dispose of any and all of the property of my estate . . . at any time they deem it advisable and in the best interests of my estate so to do." *Id.* However, there was no authorization for the trustees to lease. *Id.* The testator died possessed of a very large estate, which included two tracts in Illinois, upon which no wells had been drilled at the time of the testator's death. *Id.* The trustees, along with the life beneficiaries, entered into oil and gas leases for the Illinois tracts for consideration in the form of a bonus, one-sixteenth of all oil produced, and payment for the assignment of the lease. *Id.*

A dispute arose between life beneficiaries and the remaindermen over the funds derived from leases. *Id.* The issue was whether the funds exchanged constituted income payable to the life beneficiaries or part of the trust corpus for the remaindermen. *Id.*

The Supreme Court examined the open well doctrine and trust principles associated with such allocations and opined:

> a life tenant is entitled to the royalties from an oil well
> drilled or a coal mine opened in the lifetime of testator,

26

and, if no well be drilled or coal mine opened in testator's lifetime, but trustees are empowered by the trust instrument to lease the oil or coal, the same principle of law is applicable. *Wentz's Appeal*, 106 Pa. 301. On the other hand, if there were no wells drilled or mines opened and no power given to lease the oil or coal or authorization given to operate such business, the royalties received, or to be received, under the terms of the lease are princip[al] and not income. *See McFadden's Estate . . . .*

*Id.* at 224. The critical factor in the Court's analysis was whether the trustees were empowered by the trust instrument to lease the estate:

[W]here there is a power given to the trustee 'to sell *or lease*', the income from mines or wells opened in accordance with the power belongs to the life tenant as if the wells or mines had been opened during testator's lifetime. It was never our intention, however, that that principle should apply to a case such as the instant one, *where testator has neither authorized trustees to lease or engage in the oil or mining business*.

*Id.* at 225 (emphasis added). Thus, because the trustees did not have the power to lease, the Court determined that all revenue derived from the lease belonged to the corpus of the estate, stating:

In reality, the lease contemplates removal of all the oil and is in effect a sale, with payment to be made as the mineral is removed. Obviously, it was a sale of part of the principal of the trust and properly the moneys received therefrom belonged to the corpus.

*Id.*

Relying on *Bruner's Will* and *Blakley,* the Foundation urges us to characterize both the rentals and bonus payments as part of the principal of the trust. However, the open well doctrine does not apply here for two reasons.

27

First, the Commonwealth, as the trustee of Pennsylvania's public natural resources, has the power to convert or lease State forest lands. Pa. Const. art. I, §27; Section 302(a)(6) of the CNRA, 71 P.S. §1340.302(a)(6) (authorizing DCNR to enter oil and gas leases on State forest lands and other Commonwealth-owned resources); *see PEDF II*, 161 A.3d at 947 (concurring and dissenting op. by Baer, J., recognizing that the drafters of Section 27 contemplated "the continued, but judicious, use of the resources rather than 'some form of environmental absolutism'"). The Court in *Bruner's Will* made it clear that "where there is a power given to the trustee 'to sell or lease', the income from mines or wells opened in accordance with the power belongs to the life tenant *as if* the wells or mines had been opened during testator's lifetime." 70 A.2d at 225.

Second, by the time Section 27 was ratified, Pennsylvania had abandoned the open well doctrine in favor of a uniform statutory law, discussed below. *See* 20 Pa. C.S. §8151(c), *Uniform Law Comment*.

## 2. Statutory Law

In 1931, the National Conference of Commissioners on Uniform State Laws promulgated a model "Uniform Principal and Income Act" (UPIA).[15] The act concerned the ascertainment of principal and income and the apportionment of receipts and expenses among life tenants and remainder beneficiaries and was intended to promote uniformity of the law and remedy the inequities of common law. *See Guide to Uniform and Model Acts* (Uniform Law Commission 2018-19);[16] *see also* Walter L. Nossaman, *The Uniform Principal and Income Act*, 28

---

[15] The UPIA was revised in 1962, 1997, 2000 and, most recently, in 2008.

[16] Available at www.uniformlaws.org (last visited on July 8, 2019).

Calif. L. Rev. 34, 35 (1939). A primary purpose of UPIA was to abolish the common law's "open mine" or "open well" doctrine.[17, 18] *See* Comment to UPIA (2000).

In 1945, the Pennsylvania General Assembly adopted the UPIA, by enacting the Act of May 3, 1945, P.L. 416 (1945 Act).[19] In 1947, the General Assembly enacted its successor, the "Principal and Income Act of 1947" (1947 Act).[20] The 1947 Act repealed and replaced the 1945 Act as well as Section 22 of the "Fiduciaries Act."[21] *See former* Section 14 of the 1947 Act, *formerly*

---

[17] The doctrine was considered an inequitable distribution between present day and future interest owners because it was an either/or proposition. *See* 18 Hastings L.J. at 398; *see also* Scott §239.3; Kuntz §8.2. If a mine or well was open, the doctrine favored the life tenant or life beneficiary at the expense of the remainder in interest, and if the mine or well was not open, the inverse. *See* Scott §239.3; Kuntz §8.2; 18 Hastings L.J. at 398. If open, it allowed the complete exhaustion of the natural resources by a life tenant to the exclusion of remaindermen. *See Eley's Appeal*.

[18] It also abrogated the so-called "Pennsylvania Rule" of apportionment applicable to corporate stocks and dividends. *In re Cunningham's Estate*, 149 A.2d 72, 77 (Pa. 1959). Under the Pennsylvania Rule, a life tenant had a right to receive, as income, an apportionment of the stock dividends and the gains from the sale of stocks, which were accumulated since his ownership. *Id.* (citing *Earp's Appeal*, 28 Pa. 368, 374 (1857)); *see also McKeown's Estate* (applying Pennsylvania Rule in apportioning corporate dividends between income and principal).

[19] *Formerly* 20 P.S. §§3471-3485.

[20] Act of July 5, 1947, P.L. 1283, *as amended*, *formerly* 20 P.S. §§3470.1-3740.15.

[21] Act of June 7, 1917, P.L. 447. Section 22 of the Fiduciaries Act addressed apportionment of income, providing:

> All annuities, and all payments of rents, income, interest, or dividends of any real or personal property, directed by any will to be made during the lifetime of the beneficiary, or for the life or lives of another person or persons, or for a term of years, shall, like interest on money lent, be considered as accruing from day to day, and shall be apportioned to the date of the death of such

**(Footnote continued on next page…)**

20 P.S. §3470.14.  The 1947 Act substantially reenacted the 1945 Act, with some changes.[22]

The 1947 Act provided for the ascertainment of income and principal and apportionment of receipts and expenses between tenants and remaindermen. *Former* Section 2 of the 1947 Act, *formerly* 20 P.S. §3470.2.  Its purpose was to insure equitable treatment of various interests in trust corpus.  *In re Anthony's Estate*, 223 A.2d 857, 861 (Pa. 1966).  Indeed, "the Legislature acted to provide for a fairer, more orderly and more uniform apportionment between income and principal."  *In re Norvell's Estate*, 203 A.2d 538, 542 (Pa. 1964) (footnote omitted).

At the time Section 27 was ratified, the 1947 Act, *as amended*, was the trust law in effect.  Section 1 of the 1947 Act defined the term "principal" as used therein to mean "any realty or personalty which has been so set aside or limited by the owner thereof, or a person thereto legally empowered, that it and *any substitutions for it are to remain in trust perpetually*, or are eventually to be

---

**(continued…)**

> beneficiary or of such *cestui que vie*, or to the end of such term of years.

*Id.*

[22] The 1947 Act was subsequently amended by the Act of August 1, 1963, P.L. 442 (relating to corporate dividends), and was later codified by the Act of November 25, 1970, P.L. 707, as Title 20 "Decedents' and Trust Estates."  The 1947 Act was repealed and replaced by the Act of June 30, 1972, P.L. 508, which itself, was repealed, replaced and amended, and now stands, in its current version as the "Pennsylvania Uniform Principal and Income Act," 20 Pa. C.S. §8101-8191, which was enacted in 2002 (2002 Act).  Although the parties discuss the applicability of the 2002 Act in their briefs, they did not address the 1947 Act, which was the law in effect at the time of the Environmental Rights Amendment was ratified.

conveyed, delivered or paid to a person, while the return therefrom, or use thereof, or any part of such return or use, is in the meantime, to be taken or received by or held for accumulation for the same or another person." *Former* Section 1 of the 1947 Act, *formerly* 20 P.S. §3470.1 (emphasis added). It defined the term "income" as "the return derived from principal." *Id.* As used within the 1947 Act, the term "tenant" referred to "the person to whom income is presently or currently payable, or for whom it is accumulated, or who is entitled to the beneficial use of the principal presently and for a time prior to its distribution." *Id.* The term "trustee" included "the original trustee of any trust to which the principal may be subject and also any succeeding or added trustee." *Id.* "Remainderman" meant "the person ultimately entitled to the principal, whether named or designated by the terms of the transaction by which the principal was established, or determined by operation of law." *Id.* "The particular definitions that the Legislature adopted by the 1947 Act represent what that body determined to be a pragmatic necessity for a current, definite, more understandable and more workable rule of fair apportionment." *Norvell's Estate*, 203 A.2d at 542.

The 1947 Act governed:

the *ascertainment of income and principal and the apportionment of receipts and the expenses between tenants and remaindermen* in all cases where a principal has been established with, or, unless otherwise stated hereinafter, without the interposition of a trust: *Provided, That the person establishing the principal may himself direct the manner of ascertainment of income and principal and the apportionment of income and principal and the apportionment of receipts and expenses or grant discretion to the trustee, or other person, to do so and such provision and direction, where not otherwise contrary to the law, shall control, notwithstanding this act*.

*Former* Section 2 of the 1947 Act, *formerly* 20 P.S. §3470.2 (emphasis added).

Section 9 of the 1947 Act governed the disposition of natural resources or wasting assets, providing:

> Where any part of the principal consists of property in lands from which may be taken timber, minerals, coal, stone, oil, gas or other natural resources and *the trustee* or tenant *is authorized by the terms of the transaction by which the principal was established* or by order of court *to sell, lease or otherwise develop such natural resources* or where such natural resources have been leased or developed prior to the transaction by which the principal was established, *and no provision is made for the disposition of the net proceeds* thereof after the payment of expenses and carrying charges on such property, *one-third of the net proceeds, if received as rent or payment on a lease, or as royalties, shall be deemed income, and the remaining two-thirds thereof shall be deemed principal to be invested to produce income . . . . Such proceeds if received as consideration for the permanent severance of such natural resources from the land, payable otherwise than as rents, or royalties, shall be deemed principal to be invested to produce income.*
>
> Nothing in this section shall be construed to abrogate or extend any right, which may otherwise have accrued by law, to a tenant to develop or work such natural resources for his own use.

*Former* Section 9 of the 1947 Act, *formerly* 20 P.S. §3470.9 (emphasis added).[23]

---

[23] This was a deviation from Section 9 of the 1945 Act, as well as Section 9 of UPIA, which provided that the proceeds received by the trustee as rent on a lease shall be deemed income, but if received as consideration, whether as royalties or otherwise, for the permanent severance of such natural resources from the lands, shall be deemed principal. There was no allocation of proceeds received as rent or payment on a lease between income and principal in UPIA and the 1945 Act; it all constituted income. Unfortunately, a review of the legislative journals offers no insight as to why the General Assembly changed the law.

Our research has only revealed one case specifically addressing application of Section 9 of the 1947 Act.[24] In *In re McLean's Estate*, 85 Pa. D. & C. 129, 132 (C.P. Washington 1953), the will authorized trustees to sell at their discretion any of the assets of the trust but made no special disposition of net proceeds of any sale. Pursuant to Section 9 of the 1947 Act, the court determined that one third of the returned purchase price received from the sale of coal was income to be awarded to the income beneficiaries and the balance was principal to be invested. 85 Pa. D. & C. at 132.

Though the statutory law in this regard has since changed,[25] our directive on remand was to apply underlying principles of Pennsylvania trust law

---

[24] Cases decided after the enactment of the 1945 Act and the 1947 Act still focused on common law principles because, until *In re Catherwood's Trust*, 173 A.2d 86 (Pa. 1961), the Supreme Court held that the uniform principal and income acts could only be applied to trusts and tenancies created *after* their enactment; a retroactive application to trusts created prior to their enactment would be unconstitutional. *In re Tyler's Estate*, 289 A.2d 441, 448 (Pa. 1972); *see In re Pew's Estate*, 67 A.2d 129, 130 (Pa. 1949), *overruled in part by Catherwood's Trust*; *In re Crawford's Estate*, 67 A.2d 124, 129 (Pa. 1949), *overruled in part by Catherwood's Trust*; *see, e.g., Bruner's Will* (the will involved was dated, and decedent died, prior to the effective date of the 1945 Act and the 1947 Act; therefore, the statutory provisions did not govern; rather, common law applied). In *Catherwood's Trust*, the Supreme Court held it was not unconstitutional to give retroactive effect to the 1945 and 1947 Acts in the context of corporate stocks, but noted that "[t]he constitutionality of a retroactive operation . . . will depend on the existence or nonexistence of any vested property right in the life tenants or remainderman subject to interference by the legislative enactment." 173 A.2d at 91.

[25] *See* Section 8151 of the 2002 Act, 20 Pa. C.S. §8151. Section 8151 provides:

> (a) Allocation for receipts from minerals and other natural resources.--To the extent that a trustee accounts for receipts from an interest in minerals or other natural resources under this section, the trustee shall allocate them as follows:
>
> (1) If received as nominal delay rental or nominal annual rent on a lease, a receipt shall be allocated to income.

**(Footnote continued on next page…)**

in effect at the time of the Environmental Rights Amendment's ratification.  As the 1947 Act, as well as common law make clear, it is the testator's intent as reflected in the governing instrument that controls.  Section 9 of the 1947 Act governs trusts where the trustee is authorized to sell, lease or otherwise develop such natural resources *and* no provision is made for the disposition of the net proceeds.  *Former*

---

**(continued…)**

(2) If received from a production payment, a receipt shall be allocated to income if and to the extent that the agreement creating the production payment provides a factor for interest or its equivalent. The balance shall be allocated to principal.

(3) If an amount received as a royalty, shut-in-well payment, take-or-pay payment, bonus or delay rental is more than nominal:

(i) sixty-six and two-thirds percent shall be allocated to principal; and

(ii) the balance shall be allocated to income.

(4) If an amount is received from a working interest or any other interest not provided for in paragraph (1), (2) or (3):

(i) sixty-six and two-thirds percent of the net amount received shall be allocated to principal; and

(ii) the balance shall be allocated to income.

* * *

(c) Application.--This chapter applies whether or not a decedent or donor was extracting minerals, water or other natural resources before the interest became subject to the trust.

*Id.*

20 P.S. §3470.9. Therefore, we reexamine the intent embodied in Section 27 to determine whether Section 9 of the 1947 Act applies.

### D. Testator's Intent

As the 1947 Act and common law both make clear, the paramount principle that guides interpretation of the trust provisions is the expressed intention of the testator as reflected in the governing instrument. Section 27 is the governing instrument of the public natural resources trust. Section 27 contemplates the Commonwealth's "continued, but judicious, use of the resources." *PEDF II*, 161 A.3d at 947 (Baer, J., concurring and dissenting). As Justice Baer noted in *PEDF II*, during the drafting process of Section 27, the framers substituted the word "conserve" for "preserve" and removed the phrase "in their natural state." *PEDF II*, 161 A.3d at 947. Consequently, the drafters "did not intend to freeze the current status of the natural resources nor to prevent the Commonwealth's ability to utilize the resources." *Id.* As a result, the Commonwealth is authorized to lease the lands and develop its natural resources provided it is in the Commonwealth's best interests. *Id.*; *see also* Section 302(a)(13) of the CNRA, 71 P.S. §1340.302(a)(13) (authorizing DCNR to enter oil and gas leases when it serves the Commonwealth's best interests).

Although Section 27 expressed the intent to conserve and maintain the corpus – public natural resources – for the benefit of all the people, it made no provision for the disposition of the net proceeds obtained from the use thereof. In other words, it did not specify the method for allocating receipts. Though Section 27's intent was clear, the directions for administration of the trust were not

35

expressly delineated. Consequently, Section 9 of the 1947 Act governs the ascertainment of income and principal and the apportionment of proceeds between income and principal. *See former* 20 P.S. §§3470.2, 3470.9.

The Supreme Court in *PEDF II* apportioned royalties to the corpus because they were received as consideration for the permanent severance of natural resources from the land. *PEDF II*, 161 A.3d at 933-34 (citing *McKeown's Estate*, 106 A. at 190).[26] However, the Supreme Court did not answer the question regarding how to apportion the proceeds from rents and bonuses. Thus, we must determine whether those payments were "received as rent or payment on a lease" and therefore income, or "received as consideration for the permanent severance of such natural resources from the land" and therefore principal. We turn now to the leases themselves and the evidence presented by the parties to determine "the purpose of the up-front bonus bid payments" and rental payments. *PEDF II*, 161 A.3d at 935.

### E. State Forest Oil and Gas Leases

Section 302(a)(6) of the CNRA empowers DCNR "to make and execute contracts or leases in the name of the Commonwealth for the mining or removal of any valuable minerals that may be found in State forests . . . whenever it shall appear to the satisfaction of [DCNR] that it would be for the best interests

---

[26] We note that *McKeown's Estate* involved a trust containing corporate stock and bonds, not realty or mineral leases and the application of the "Pennsylvania Rule." The apportionment of corporate dividends and share rights have their own unique nuances at common law and statutory law. *See Cunningham's Estate*, 149 A.2d at 77; *Earp's Appeal*, 28 Pa. at 374*; see also* Section 5 of the 1947 Act (governing corporate dividends and share rights).

of this Commonwealth to make such disposition of those minerals." 71 P.S. §1340.302(a)(6). Section 302(a)(6) further provides:

> Any proposed contracts or leases of valuable minerals exceeding $1,000 in value shall have been advertised once a week for three weeks, in at least two newspapers published nearest the locality indicated, in advance of awarding such contract or lease. The contracts or leases *may then be awarded to the highest and best bidder*, who shall give bond for the proper performance of the contract as [DCNR] shall designate. However, where the Commonwealth owns a fractional interest in the oil, natural gas and other minerals under State forest lands, the requirement of competitive bidding may be waived, and [DCNR] may enter into a contract to lease that fractional interest, with the approval of the Governor, and upon such terms and conditions as [DCNR] deems to be in the best interest of this Commonwealth.

*Id.* (emphasis added).

### 1. Leases

Pursuant to this authority, in 2008, DCNR approved a lease sale of 74,000 acres of State forests. *PEDF II*, 161 A.3d at 920; *see* Petitioner's Amended Application for Relief, Exhibit A (Information identifying 18 tracts comprising 74,023 acres offered for sale in September 2008); Respondents' Joint Brief in Support of Summary Relief, Exhibit B (Deposition of Daniel Devlin, 2/15/18) at 27 (Devlin Deposition). DCNR conducted a competitive, sealed bid process and received bids ranging from $2,104,028 for 1,828 acres to $28,451,200 for 8,891 acres. Petitioner's Amended Application for Relief, Exhibit A (Affidavit of John H. Quigley, 6/29/17) at 1 (Quigley Affidavit); Respondents' Application for Summary Relief, Exhibit A (Declaration of John Norbeck, 5/2/18) (Norbeck Declaration) ¶14. In January 2009, DCNR executed oil and gas leases for these

tracts with companies that offered the highest bids (referred to as "first year's land rental" or bonus payments) on the State forest tracts offered for oil and gas extraction and sale (January 2009 Leases). Petitioner's Amended Application for Relief, Exhibit A (bid details).

Thereafter, DCNR held additional State forest lease sales and entered leases for those tracts in January 2010 for 32,000 acres (January 2010 Leases) and May 2010 for 33,000 acres (May 2010 Leases) with the highest bidders. *See* Quigley Affidavit at 1-2; Petitioner's Amended Application for Relief, Exhibits B (1/8/09 Lease for State Forest Tract No. 728), C (1/20/10 Lease for State Forest Tract No. 001), and D (5/10/10 Lease for State Forest Tract No. 728). In February 2013, DCNR held a lease sale for publicly owned streambeds (2013 Streambed Leases). *See* Petitioner's Amended Application for Relief, Exhibit E (2/15/13 Lease for Streambed Tract No. 2004).[27]

In general, the leases established a lease term of 10 years. The primary term of the lease is five years during which time the lessee must "commence a well" or the lease will automatically terminate. The lease "shall continue from year-to-year thereafter so long as oil or gas is produced in paying quantities from the leased premises, . . . or as long as Lessee demonstrates to [DCNR's] satisfaction bona fide attempts to secure or restore the production of oil and gas by conducting drilling or reworking operations on the leased premises. *See* Petitioner's Amended Application for Relief, Exhibits B, C and D, §1. When

---

[27] The Foundation attached full copies of the leases to its Amended Application for Relief. According to the parties, the leases identified as exhibits are representative of the Commonwealth leases involved in the respective lease sales.

the primary lease term ends without commencement of production by the lessee, the lease contract expires. *Id.* §20.

The leases also generated funds in the form of: (1) bonus bid, (2) rental, (3) royalty, and (4) interest on late payments. Petitioner's Amended Application for Relief, Exhibits B, C and D, §§3-6; Norbeck Declaration ¶4; *see PEDF II*, 161 A.3d at 920-21. Of relevance to our discussion are the bonus and rental payments, which are both incorporated under the "RENTAL" section of DCNR's standard lease agreements. Pursuant to the "RENTAL" provision, lessees are required to pay to DCNR a bonus bid, which is referred to as a "bonus rental payment" for the first year, and "rental payments" for years 2 through 10. Petitioner's Amended Application for Relief, Exhibits B, C and D, §3. The leases classify oil and gas royalties and penalty interest separately. *Id.* §§4-6, 7.03.

Aside from the first year's bonus payment, the rents are comprised of annual rental fees, ranging from $20-25 per acre, in addition to an initial "bonus payment." *Id.* §3. For example, the January 2009 Leases provide:

3. RENTAL

3.01 Lessee shall pay to [DCNR] a rental for the leased premises at the following rate: *the first year's rental shall consist of the bonus payment which was made by Lessee and shall be payable upon delivery of this lease to Lessee.* The second, third and fourth year's rentals shall be TWENTY DOLLARS ($20.00) per acre each year, payable upon the anniversary date of this lease. For the fifth and all subsequent years thereafter, the rental shall be THIRTY-FIVE DOLLARS ($35.00) per acre each year, payable on the anniversary date of this lease.

Petitioner's Amended Application for Relief, Exhibit B, §3.01 (emphasis added). The preliminary provision of this lease set forth:

> NOW THEREFORE, in consideration of the sum of TWELVE MILLION TWO HUNDRED EIGHTY-SEVEN THOUSAND TWO HUNDRED THIRTY-NINE DOLLARS ($12,287,239.00) paid by Lessee to [DCNR], receipt of which is hereby acknowledged, and other mutual covenants and agreements hereinafter set forth, [DCNR] does hereby grant, demise, lease, and let, exclusively unto Lessee for the purposes only of exploring, drilling, operating, producing, and removing of oil, gas and liquid hydrocarbons; and at locations subject to the approval of District Forester, acting for [DCNR], the laying of pipelines and the building of roads, tanks, towers, stations, and structures thereon to produce, save, take care of, and transport said products, all that certain tract of land, TRACT NO. 728 containing 4,621 acres . . . .

*Id.* While the rental prices are consistent from lease to lease, the subject tracts and bonus prices vary. *See* Petitioner's Amended Application for Relief, Exhibits B, C and D, §3.

Significantly, the rental payments are reduced by the number of wells producing in paying quantities, i.e., royalties. Petitioner's Amended Application for Relief, Exhibits B, C and D, §§3, 4, 5, 20. In effect, if the lessee drills enough productive wells, per the spacing terms set forth in the lease, lessee may not owe any rentals during the lease term. *See id.* If, however, a well that is capable of producing natural gas is "shut in, suspended, or otherwise not produced and the natural gas is not used or marketed," lessee must pay rent. *See, e.g.*, Petitioner's Amended Application for Relief, Exhibit B, §3.03.

The wording and placement regarding the bonus payment changed slightly in the January 2010 Lease, which provides:

3. RENTAL

3.01   Lessee shall pay to [DCNR] *a bonus rental payment* of THREE THOUSAND ONE HUNDRED TWENTY FIVE DOLLARS ($3,125.00) *per acre for the leased premises for the first year*, which equates to a total payment of TWENTY THREE MILLION, TWO HUNDRED FIFTY THREE THOUSAND, ONE HUNDRED TWENTY FIVE DOLLARS DOLLARS [sic] ($23,253,125.00), no later than 5:00 p.m. EST, Friday, March 12, 2010.

Petitioner's Amended Application for Relief, Exhibit C, §3.01 (emphasis added).

The preliminary provision of this lease set forth:

NOW THEREFORE, in consideration of the foregoing and the mutual promises contained herein, and intending to be legally bound, the parties agree as follows:

1. LEASE TERM

1.01 [DCNR] hereby leases to Lessee all that certain tract of land known as TRACT NO. 001 containing approximately 7441 acres . . . for the sole purposes of (1) exploring, drilling, operating, producing, and removing of oil, gas and liquid hydrocarbons; and (2) at locations approved by [DCNR], laying pipelines and constructing roads, tanks, towers, stations, and structures thereon to produce, save, take care of, and transport extracted products.

*Id.* The May 2010 Leases and 2013 Streambed Leases were similarly structured to the January 2010 Leases. *Compare* Petitioner's Amended Application for Relief, Exhibit C *with* Exhibits D and E.

## 2. Other Evidence

The parties also presented other evidence regarding the nature and purpose of these payments. John Norbeck, Deputy Secretary for DCNR's Parks and Forestry, attested that DCNR utilizes a formal bidding process for most of its

oil and gas leases. Norbeck Declaration ¶6. The successful lessee is often determined by its high bid, i.e., bonus payment. *Id.* The bonus payment is money paid to DCNR after successfully obtaining a lease. *Id.* ¶5. Norbeck stated: "Not all leases result in the extraction of oil or gas, but every lessee pays a bonus payment. *Id.* Rental payments are required to be paid to DCNR on an annual basis prior to, and notwithstanding, the extraction of oil or gas. *Id.* DCNR's oil and gas leases provide that DCNR retains any bonus payments and rentals received even when no oil or gas is produced. *Id.* ¶11. Similarly, interest charged on late payments is due when no oil or gas is produced. *Id.* Royalty payments, on the other hand, are directly related to the extraction of oil and gas and only become due and owing if oil or gas is extracted from the public natural resource. *Id.* ¶10.

Norbeck further attested that between 2003 and 2015, DCNR terminated 16 oil and gas leases with various operators because no oil or gas was extracted from the tracts under the lease; there was no sale of public natural resources in those scenarios. *Id.* ¶13. Norbeck provided specific examples of oil and gas leases that were terminated for lack of production. *Id.* ¶14(a)-(p). Based on these 16 terminated leases, DCNR received and retained a total of $120,479,684 in bonus payments and $3,528,630 in rental payments, without any gas or oil removed. *Id.* ¶¶14-15.

John H. Quigley, who formerly served in several executive positions with DCNR between 2005 and 2011, was involved in all of the activities and decisions related to the lease sales conducted by DCNR between 2008 and 2010. He attested that "[t]he bonus bid was designed to reflect the partial or potential value of the natural gas that would be extracted." Quigley Affidavit at 2. According to Quigley, the competitive bonus bid component of the process was the

42

basis upon which DCNR awarded the leases and granted access to State forest land. *Id.* Under the leases, DCNR received bonus bids, annual rentals and royalties, which were all deposited into the Lease Fund. *Id.*

Daniel Devlin, the current Director of the Bureau of Forestry, testified by deposition as DCNR's designated representative to answer questions regarding the origin, history, and purpose of bonus payments. Devlin Deposition, at 4, 11-12, & Exhibit A (Application for Determination of Bonus Payments Notice of Deposition). Devlin testified regarding the process leading to the execution of a lease. Oil and gas companies "nominate land" and ask DCNR to put it up for bid. Devlin Deposition, at 9. DCNR conducts an environmental review to determine if the tract is suitable for leasing. *Id.* at 9-10. Once a tract is chosen, DCNR advertises the tract in multiple outlets with bidding instructions. *Id.* DCNR usually conducts a sealed bid, which includes a bonus bid component. *Id.* at 10-11.

Devlin described the bonus component of the bids as "an up front payment that's to differentiate who is the high bid[der]." *Id.* at 13. It is "a method to differentiate the different bidders, in other words to get the highest bid." *Id.* at 11. DCNR places a minimum bid on the tract, "but the bonus bid is really what the companies are willing to pay for that particular tract of land. From our perspective, it's our fiduciary responsibility to get the best value for the tract of land possible." *Id.* at 11. Normally, the company with the highest bid is awarded the oil and gas lease. *Id.* at 11. The bid determined "who got the right to explore and potentially extract gas." *Id.* at 31-32.

Devlin differentiated royalties and rentals from bonuses. Rentals, he explained, are a "set fee" established in the bid proposal and lease itself. *Id.* at 13. Rentals are due every year under the terms of the lease regardless of whether the

company develops the tract. *Id.* "A royalty is when they actually do the extraction, and royalty is determined again by the lease, and it is usually a percentage of the income generated by the company." *Id.* at 32. The lease "specifies the amount of royalty." *Id.*

Devlin testified that the Commonwealth has leased public land since the 1950s and the royalties, rents, and bonus bid payments have gone into the Lease Fund. *Id.* at 17, 13-14, 30. Devlin did not know whether the transfers from the Lease Fund to the General Fund per the fiscal amendments derived from royalties, rents, bonus bid payments, or from some combination of the three sources. *Id.* at 32-33, 35.

Stacie Amsler, DCNR's Director of Administrative Services, testified by deposition as the designated representative to answer questions regarding the history of the use of bonus payments. Respondents' Joint Brief in Support of the Application for Summary Relief, Exhibit C (Deposition of Stacie Amsler, 2/15/18) at 4. Amsler testified that bonus payments, rents, royalties and interest go into the Lease Fund and have since the Lease Fund Act was established in 1955. *Id.* at 5. The payments are coded separately in the general ledger accounts. *Id.* at 5.

## F. Analysis

Based upon the evidence presented and our review of Pennsylvania's trust law in effect in 1971, we conclude that bonus and rental payments are not for the severance of natural resources. Rather, these payments are consideration for the exploration for oil and gas on public land. More particularly, the rentals secure the lessee's right to enter the property for exploratory and development purposes and the rents accrue based on mere passage of time, not the production of oil or

44

gas.  The purpose of the bonuses is to determine the highest bidder for the award of the lease.  The bonuses are consideration for the execution of the lease, and not consideration for severance of the mineral.

Though bonuses and rental payments are made in anticipation of extraction, these payments relate directly to the lessee's ability to secure the lease and the right to explore for oil and gas on the property.  As demonstrated by the evidence presented, the Commonwealth is entitled to keep this money regardless of production, even when the lease is terminated.  Thus, we conclude that these payments were received as rent or payment on a lease and were not "received as consideration for the permanent severance" of natural resources from the land.[28] *See former* 20 P.S. §3470.9.

Pursuant to *former* Section 9 of the 1947 Act, "one-third of the net proceeds, if received as rent or payment on a lease, . . . shall be deemed income, and the remaining two-thirds thereof shall be deemed principal to be invested to produce income."  Therefore, we conclude that one third of the rental and bonus payments going into the Lease Fund constitute income; the other two thirds of

---

[28] We note the Supreme Court's admonition that "the Commonwealth, as trustee, has a constitutional obligation to negotiate and structure leases in a manner consistent with its Article 1, Section 27 duties." *PEDF II*, 161 A.3d at 936.  Consequently, "[o]il and gas leases may not be drafted in ways that remove assets from the corpus of the trust or otherwise deprive the trust beneficiaries (the people, including future generations) of the funds necessary to conserve and maintain the public natural resources." *Id.*  After a careful review of the leases at issue and industry norms, DCNR has utilized standard industry leases, which have included rents, bonuses and royalties as forms of payments since oil and gas development began.  DCNR did not structure or draft the leases in an attempt to remove rents and bonuses from the corpus of the trust.  Rather, by securing the highest bid through a competitive bid process, DCNR has acted in the best interests of the Commonwealth.  The Commonwealth has not neglected its fiduciary obligations as trustee.

rental and bonus payments constitute part of the corpus. *See former* 20 P.S. §3470.9.

Because proceeds designated as "income" are not required to remain in the corpus of the Section 27 trust and used solely for the conservation and maintenance of our public resources, this money may be appropriated for General Fund purposes. *See PEDF II*, 161 A.3d at 936. Therefore, Sections 1604-E and 1605-E of The Fiscal Code and Section 1912 of the Supplemental General Appropriations Act of 2009, which directed the transfer of money from the Lease Fund to the General Fund, are not facially unconstitutional under Article I, Section 27 of the Pennsylvania Constitution. However, an accounting is necessary to ensure that only one-third of the proceeds allocable to income are removed from the Lease Fund for non-conservation purposes and that the funds designated as principal are ultimately used in accordance with the trustee's obligation to conserve and maintain our natural resources. *See PEDF II*, 161 A.3d at 939.

This disposition fulfills Section 27's purpose and intent to "conserve and maintain" Pennsylvania's public natural resources for the benefit of all the people while also allowing today's generation of Pennsylvanians to benefit in other ways from the revenue produced. The 1947 Act's allocation of proceeds to principal and income reflects an equitable balance between the needs of present and future generations of Pennsylvanians. This equitable balance was strived for in the UPIA and the 1947 Act, and is similarly reflected in today's law.[29] This result is not only a reasonable construction of Section 27's intent, but is in strict

---

[29] *See* Section 8151 of the 2002 Act, 20 Pa. C.S. §8151 (apportioning one-third of rentals and bonus payments to income and two-thirds to principal).

accordance with the Supreme Court's mandate on remand to apply Pennsylvania trust law in effect when Section 27 was ratified.

## IV. CONCLUSION

Accordingly, we grant the Commonwealth's application for summary relief upon concluding that Sections 1604-E and 1605-E of The Fiscal Code (72 P.S. §§1604-E and 1605-E), and Section 1912 of the Supplemental General Appropriations Act of 2009 are not facially unconstitutional. We deny the Foundation's application for summary relief.

_____
MICHAEL H. WOJCIK, Judge

Judge Fizzano Cannon did not participate in the decision of this case.

47

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Pennsylvania Environmental        :
Defense Foundation,             :
                                  :
                  Petitioner     :
                                  :
                    v.          : No. 228 M.D. 2012
                                  :
Commonwealth of Pennsylvania,  :
and Governor of Pennsylvania,    :
Thomas W. Corbett, Jr., in his official  :
Capacity as Governor,          :
                                  :
               Respondents  :

# **O R D E R**

AND NOW, this 29th day of July, 2019, Respondents' application for summary relief is hereby GRANTED, and Petitioner's application for summary relief is DENIED in accordance with the foregoing opinion.

_____
MICHAEL H. WOJCIK, Judge